No. 02-668

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 317

STATE OF MONTANA,

Plaintiff and Respondent,

v.

PATRICK B. DEWITT,

Defendant and Appellant.

APPEAL FROM:     District Court of the Second Judicial District,
In and for the County of Silver Bow, Cause No. DC 2001-95
The Honorable John W. Whelan, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Penelope Strong, Yellowstone County Public Defender's Office, Billings, Montana

For Respondent:

Honorable Mike McGrath, Montana Attorney General, Jim Wheelis, Assistant Attorney General, Helena, Montana; Robert M. McCarthy, Silver Bow County Attorney, Butte, Montana

Submitted on Briefs:  July 17, 2003

Decided:   November 12, 2004

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     Patrick DeWitt (DeWitt) was convicted of two counts of aggravated burglary. He appeals his conviction on several grounds. We affirm in part and reverse and remand in part.

## ISSUES

¶2     A restatement of the issues before this Court is:

¶3     Did the District Court err in denying DeWitt's Motion to Suppress?

¶4     Did the District Court err in denying DeWitt's Motion to Dismiss and his Motion for a Directed Verdict?

¶5     Was DeWitt placed in double jeopardy by his consecutive sentences for two counts of aggravated burglary arising from one illegal entry?

¶6     Did DeWitt receive ineffective assistance of counsel?

## FACTUAL AND PROCEDURAL BACKGROUND

¶7     On July 28, 2001, at approximately 1 a.m., Donna Nicholls, who is legally blind, was awakened by feeling someone on top of her husband Harold, who was lying next to her in bed. She attempted to determine, by touch, who or what it was. When she realized it was a man beating Harold, she began hitting at him in an effort to get him off of Harold. The attacker then began beating her in the face. She managed to turn on a reading light affixed to the headboard of their bed and the intruder fled. With the lamplight, she was able to discern the figure of a man running away. Donna sustained a fractured cheek and multiple bruises on her face, arms and chest.

2

¶8     Meanwhile, Harold Nicholls awoke to find himself lying in a pool of blood and sliding from his bed to the floor.  He does not recall the attack that left him with a broken nose, and multiple cuts and bruises.  He does recall that as his wife turned on a light, he saw the silhouette of a man running from the room.  At the time of the attack, Donna was 72 years old and Harold was 75.

¶9     Donna called 9-1-1 and the police arrived promptly.  Harold and Donna could not identify their attacker but described a large man wearing a sweatshirt or teeshirt, and Donna thought she felt "something over his face" such as a ski mask.  As the police were looking for evidence outside the Nicholls' home, Tiffany Dawes, the Nicholls' next-door neighbor, drove up.  Dawes told police that she had received a disturbing phone call from her ex-fiancé, DeWitt, shortly after 1 a.m.  Dawes said DeWitt sounded intoxicated and uncharacteristically calm, and that she was frightened because she knew DeWitt could be violent.  She explained that she had moved since breaking up with DeWitt, but that DeWitt had followed her home one night and knew generally where she lived.  She informed the officers that DeWitt had called from the nearby home of Marty Anzik and showed them her caller ID unit confirming this.

¶10    The police, who knew DeWitt from previous encounters, found the timing of the disturbing phone call, the proximity of Dawes' house to the Nicholls, and the attack, to be sufficiently suspicious to warrant going to Anzik's house.  When they arrived, no one answered the door but DeWitt's truck was in the driveway and its engine was warm.  The officers noticed a light on inside Anzik's garage, approached the side entry door, and

3

knocked on it. Both officers testified that the door was not closed or latched and opened upon the impact of the knock. As soon as the door opened, the officers detected smoke hanging in the air and the smell from a two-stroke engine recently being started. The police entered the garage, confirmed that no one was inside and left. They took nothing from the garage and closed the door when they departed. Based upon the presence of DeWitt's truck and the strong smell of exhaust and smoke in the air, the officers surmised that DeWitt may have been at Anzik's home and left on a motorcycle shortly before their arrival.

¶11 Again, from previous encounters with DeWitt, the police knew that he was staying with Bill Robinson. Upon arriving at Robinson's residence, the police noticed a two-stroke engine motorcycle parked outside Robinson's house. The engine was warm. The officers knocked on the door and Robinson and his guests opened the door. Robinson, in response to questions, identified the motorcycle as belonging to Anzik and said that it had not been there earlier in the evening. He also said he did not know if DeWitt was there because he had just arrived and had not seen him. Robinson then gave the officers consent to search his home for DeWitt.

¶12 The officers found DeWitt sitting on a couch in a dimly-lit basement room drinking a beer. They shone a flashlight on DeWitt and noticed what appeared to be bloodstains on his jeans and dark stains around his fingernails, also possibly blood. They also observed that DeWitt's right knuckle was swollen, red and bloody. They asked him to stand, at which time they handcuffed him and took him to the detention center.

¶13 Upon arrival at the detention center, DeWitt was photographed. The photographs document what appeared to be blood on DeWitt's jeans. The pictures also show the blood on DeWitt's hands and behind one of his ears. A serologist testified at trial that the blood from DeWitt's jeans and shirt matched Harold Nicholl's DNA profile.

¶14 DeWitt was questioned and videotaped at the police station. DeWitt eventually asked that the video recorder be turned off. DeWitt emotionally told the officers that he had had "a lot of alcohol" and he went into what he thought was Dawes' house to check her caller ID to find out who had been calling her. He claimed that when he went into the bedroom, a man yelled at him and hit him with a club or stick. DeWitt said that he "elbowed" the people in the bedroom in order to get away. The police did not find a club or stick in the Nicholls' home.

¶15 The State charged DeWitt with two counts of felony aggravated burglary in violation of § 45-6-204(2)(b), MCA (1999). The State alleged that DeWitt entered and remained unlawfully in the home of Harold and Donna Nicholls and caused them bodily injury while in their home. A jury trial was held from March 19 - 21, 2002, at the conclusion of which DeWitt moved for a directed verdict and dismissal. The District Court denied the motions without comment. The jury found DeWitt guilty of both counts.

¶16 Prior to his sentencing hearing, DeWitt moved to have counsel replaced. At the inception of the hearing, the court considered DeWitt's request and listened to DeWitt's general and vague complaints. The court acknowledged that DeWitt was not satisfied with the outcome of his trial but stated that he had had "great representation" during it. The judge

5

asked DeWitt if he could work with his counsel for the sentencing hearing. DeWitt responded that he would prefer not to but also stated that he was not competent to represent himself during sentencing. The District Court denied DeWitt's motion to stay sentencing pending replacement of counsel and ruled that DeWitt's counsel would act as standby counsel. The court then "urged" DeWitt to cooperate with his counsel.

¶17 On July 19, 2002, the District Court sentenced DeWitt to two consecutive ten year sentences at Montana State Prison (MSP). The court also determined that DeWitt was a persistent felony offender. It sentenced DeWitt to a third ten year sentence at MSP to run consecutively with his other sentences.

¶18 DeWitt appeals.

## STANDARD OF REVIEW

¶19 Because multiple standards of review are applicable in this case, each standard of review will be presented with its corresponding issue.

## DISCUSSION

¶20 Did the District Court err in denying DeWitt's Motion to Suppress?

¶21 We review a district court's denial of a motion to suppress "to determine whether the court's findings of fact are clearly erroneous and whether its interpretation and application of the law are correct." *State v. Meyer*, 2004 MT 272, 323 Mont. 173, ___ P.3d ___ (citation omitted). A court's findings are clearly erroneous if they are not supported by substantial credible evidence, the court has misapprehended the effect of the evidence, or our review of the record convinces us that a mistake has been committed. We review a district court's

6

conclusions of law to determine whether the interpretation of the law is correct. *In re Guardianship & Conservatorship of Gilroy*, 2004 MT 267, 323 Mont. 149, ___ P.3d ___. In reviewing a district court's conclusion of law, our standard of review is plenary and this Court must determine whether its interpretation of the law is correct. *RSG Holdings v. Missoula Irrigation Dist.*, 2004 MT 214, ¶ 9, 322 Mont. 369, ¶ 9, 96 P.3d 1131, ¶ 9 (citation omitted).

¶22 DeWitt sought to suppress the evidence obtained by the officers when they entered Anzik's garage and the evidence obtained during both the search of Robinson's home and DeWitt's arrest. He based his suppression motion on the lack of a warrant authorizing entry into both residences.

¶23 DeWitt claims that entry into Anzik's garage was illegal and therefore all evidence and observations directly resulting from that search must be suppressed. He maintains that

neither he[1] nor Anzik granted permission to the officers to enter the garage and without such consent or a warrant, entry by the police was a violation of his constitutional rights under the Montana and U.S. Constitutions.

¶24 DeWitt posits that the officers did not see the smoke in the garage or smell the exhaust until after they had unlawfully entered the garage. However, the officers maintain that upon knocking on the door, it swung open and the smoke and odor were readily apparent before entering the garage. The officers then entered, noted that it was uninhabited, took nothing and left. The State, therefore, asserts that the evidence was obtained through the "plain view" doctrine while the officers were lawfully on Anzik's property outside the garage and that no evidence was obtained once the officers entered the garage.

¶25 The Fourth Amendment of the United States Constitution, as well as Article II, Section 11, of the Montana Constitution, affords all persons freedom from unreasonable searches and seizures. Searches conducted within a home or a garage are *per se* unreasonable, subject to a few exceptions. *U.S. v. Oaxaca* (9th Cir. 2000), 233 F.3d 1154, 1157. One such exception is the "plain view" doctrine. If, while a police officer is lawfully on the property and in the course of his or her lawful presence, the officer comes across a piece of incriminating evidence that is in plain view and its incriminating nature is "immediately apparent," that evidence may be used against the defendant. *State v. Loh*

---

[1] DeWitt had only recently moved from Anzik's residence and still had some of his belongings stored in Anzik's garage. He argued that this gave him a "possessory and privacy interest in the building" sufficient to accord him standing to challenge the alleged illegal entry.

(1996), 275 Mont. 460, 469, 914 P.2d 592, 600 (citation omitted).  *See also*, *State v. Weaselboy*, 1999 MT 274, 296 Mont. 503, 989 P.2d 836; *State v. Bassett*, 1999 MT 109, ¶ 52, 294 Mont. 327, ¶ 52, 982 P.2d 410, ¶ 52.

¶26    During a suppression hearing on January 29, 2002, the court heard testimony from both of the officers and from Anzik.  While Anzik testified that the door sticks and when closed requires a kick to the bottom of it to open it, the officers, who were actually there on the night in question, testified that the door was not shut completely and therefore it did not stick.  Anzik was out of town at the time and had no way of knowing whether on that night at that hour the door was opened or closed.  The District Court, whose province it is to hear the evidence and weigh conflicting testimony, found the officers and their testimony to be credible.  *In re A.F.*, 2003 MT 254, ¶ 24, 317 Mont. 367, ¶ 24, 77 P.3d 266, ¶ 24.

¶27    We conclude that the record supports the District Court's finding that the door opened upon impact of the officer's knock and that the officers immediately noticed the smoke and smell of the recently-ignited motorcycle.  As a result, the evidence regarding the motorcycle was in "plain view" and falls squarely within the plain view exception and was admissible.

¶28    We next examine whether the officers' entry into Robinson's home was lawful or whether, as a result of an unlawful entry, the evidence obtained during DeWitt's arrest was inadmissible.  As indicated above, Robinson, the owner of the home, consented to the officers' entry and allowed them to look for DeWitt, whom they found in the basement.

¶29    DeWitt argues that because Robinson did not have the right to consent to a search of the part of Robinson's home that DeWitt was renting,  the officers' presence in the basement

9

was unlawful and any evidence derived therefrom was inadmissible. DeWitt also complains that there existed no probable cause for his arrest. The State insists that Robinson's consent was sufficient. The State also maintains that by the time the officers arrived at Robinson's home, the cumulative information derived since the attack supplied ample probable cause for the officers to enter without Robinson's consent but merely upon confirmation that DeWitt lived there. The State asserts that the police were justified in entering Robinson's home, without a warrant, under both the "hot pursuit" theory and the "exigent circumstances" theory.

¶30    The court concluded that Robinson consented to the search and that the room in which the officers found DeWitt was furnished in a manner "consistent with its use by all of the occupants of the residence." Therefore, because Robinson had common authority to use and exert control over the den area in the basement where DeWitt was found, the consent was adequate. The court also concluded that exigent circumstances justified DeWitt's arrest without a warrant and that the cumulative evidence established probable cause for the officers' beliefs that DeWitt may have committed the assaults.

¶31    Because we conclude that the facts presented above are supported by the record and provided the District Court with sufficient evidence to conclude that the officers' entry into Robinson's home was consensual, we need not determine whether exigent circumstances existed that would also justify a warrantless entry by the officers. Based upon evidence of Robinson's consent, the District Court did not err in denying DeWitt's Motion to Suppress the evidence obtained from the entry and arrest.

¶32     DeWitt, in identifying his issues before this Court, asked that we determine whether the Information was defective.  We conclude, however, that the correct issue is whether the District Court erred by denying DeWitt's Motion to Dismiss and whether the court abused its discretion by denying DeWitt's Motion for a Directed Verdict.

¶33     The grant or denial of a motion to dismiss in a criminal case is a question of law which is reviewed *de novo* on appeal.  *State v. Gazda*, 2003 MT 350, ¶ 10, 318 Mont. 516, ¶ 10, 82 P.3d 20, ¶ 10.

¶34     We review a district court's denial of a motion for a directed verdict to determine whether the court abused its discretion. In doing so, we determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the offense beyond a reasonable doubt.  *State v. Ruiz*, 2004 MT 135, ¶ 7, 321 Mont. 357, ¶ 7, 91 P.3d 565, ¶ 7 (citations omitted).  Abuse of discretion occurs only when the district court acted arbitrarily without the employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice.  We review questions of law *de novo*.  *Jacobsen v. Thomas*, 2004 MT 273, ¶ 10, 323 Mont. 183, ¶ 10, ___ P.3d ___, ¶ 10 (citation omitted).

¶35     The State charged DeWitt by Information with two counts of felony aggravated burglary in violation of § 45-6-204(2)(b), MCA, (1999).  The relevant part of this statute states:

> (2) A person commits the offense of aggravated burglary if he knowingly enters or remains unlawfully in an occupied structure with the purpose to commit an offense therein and:

11

. . .

(b) in effecting entry or in the course of committing the offense or in immediate flight thereafter, he purposely, knowingly, or negligently inflicts or attempts to inflict bodily injury upon anyone.

¶36 DeWitt's Information stated, in relevant part:

COUNT I: Defendant, Patrick B. DeWitt, knowingly entered or remained unlawfully in an occupied structure with the purpose to commit an offense therein, and in the course of committing the offense, [DeWitt] purposely, knowingly or negligently inflicted bodily injury upon Harold Nicholls.

Count II was identical with the exception of replacing Harold's name with Donna's.

¶37 DeWitt's complaint against the Information is three-fold. First, he asserts that the Information was defective because it failed to state what offense he intended to commit when he knowingly entered the Nicholls' home and unlawfully remained there. He claims that, as a result, it failed to give him adequate notice of the crime he had allegedly committed.

¶38 Second, he claims that because the Information did not state what offense he intended to commit once within the Nicholls' home, the evidence presented at trial, even when viewed in the light more favorable to the prosecution, was insufficient to support a finding or verdict of guilt of this unidentified offense. Third, DeWitt claims that the Information alleges that he unlawfully broke into *one* residence, *one* time, but he was nonetheless wrongly charged with *two* counts of aggravated burglary. DeWitt asserts that the State divided his one crime into two crimes and created an illegal and defective, multiplicitious Information.

12

¶39    In response, the State claims that the charging document and the Application for Leave to File the Information adequately informed both DeWitt and the jury that DeWitt's "offense therein" was assault on Donna and Harold Nicholls.

¶40    DeWitt relies on *State v. Hardaway*, 2001 MT 252, 307 Mont. 139, 36 P.3d 900. In *Hardaway*, the Information charged Hardaway with either a theft or a sexual crime. We reversed Hardaway's burglary conviction, concluding that the term "sexual crime" was too vague for a person of common knowledge to know what offense the State was charging. Citing *State v. Steffes* (1994), 269 Mont. 214, 887 P.2d 1196, we explained that "[t]he standard applied to determine if an information is sufficient, is whether a person of common understanding would know what was charged." *Hardaway*, ¶ 67. We noted in *Hardaway* that while numerous sexually-related offenses were defined in the Montana Code Annotated, the offense of "sexual crime" was not defined. We also concluded that Hardaway's Information "fail[ed] to provide any factual allegations that would indicate which of the potential offenses of a sexual nature Hardaway [was] being accused of intending to commit."

¶41    *Hardaway* is distinguishable from the case at bar in that Hardaway could not prepare a defense because he did not know of which sexually-related offense he was being accused, *or* if he was being accused of theft. In the case before us, while the language in the Information is arguably less artful than it could be, it is apparent that the State viewed the "offense therein" to be the assaults on Donna and Harold Nicholls. Moreover, our review of the record indicates that the jury was also adequately informed based upon the contents of the charging document, the evidence at trial, the prosecutor's opening statement and the

13

final argument. Therefore, we conclude that the Information adequately informed both DeWitt and the jury that the "offense therein" was assault. As a result, the District Court did not err by denying DeWitt's Motion to Dismiss on the grounds that it failed to state an "offense therein." We also conclude, based on our review of the record, that sufficient credible evidence, described in detail in paragraphs 1 - 16 above, was presented to support the jury's verdict. Therefore, the court did not abuse its discretion by failing to direct a verdict in DeWitt's favor.

¶42   As for DeWitt's third grievance concerning the legitimacy of the Information, we agree with DeWitt. The crime of aggravated burglary requires: 1) an unlawful entry or unlawfully remaining on premises when the privilege to remain has been revoked; 2) entering or remaining with the purpose to commit an offense therein, in this case, assault; and 3) during entry, departure, or commission of offense purposely, knowingly, or negligently inflicting bodily injury upon anyone. Section 45-6-204(2)(b), MCA. DeWitt argues that one entry into one residence one time can result in only one charge of aggravated burglary.

¶43   The State argues that DeWitt remained unlawfully in the Nicholls' home and while so doing assaulted two different people, thus justifying the charging of two crimes. However, it is the unlawful entry with the intent to commit an offense that provides the gravamen of the offense of aggravated burglary. Here, while two persons may have been injured, there was only one unauthorized entry.

14

¶44 The State relies on *State v. Weigle* (1997), 285 Mont. 341, 947 P.2d 1053, to support its claim that two charges are justified because there are two victims. Weigle was charged with one count of driving under the influence and two counts of negligent homicide after he ran head-on into an oncoming vehicle killing both people in the oncoming car. Weigle ultimately pled guilty to all counts and was sentenced to ten years consecutive on each of the negligent homicide counts. He argued on appeal that his consecutive sentences constituted double jeopardy because both homicides arose from a single automobile accident. The Court concluded that Weigle:

> twice violated § 45-5-104, MCA, which provides in pertinent part: '[a] person commits the offense of negligent homicide if he negligently causes the death of another human being.' There is no question that, since two people were killed in the collision, two distinct offenses were committed. 'When the same transaction may establish the commissions of more than one offense, a person charged with the conduct may be prosecuted for each offense.'

*Weigle*, 285 Mont. at 344, 947 P.2d at 1055.

The Court further noted that:

> although each count of negligent homicide alleged a violation of the same statute by the same act, each count required proof of an additional fact that the other count did not, namely the death of the particular victim.

*Weigle*, 285 Mont. at 344, 947 P.2d at 1055.

¶45 *Weigle* is readily distinguishable from the case at bar. The State did not charge Weigle with two counts of driving under the influence. It rightly charged Weigle with one count of DUI and two counts of negligent homicide under a statute that intends each homicide to be a distinct offense. In the case before us, the State could have charged DeWitt

15

with one count of aggravated burglary and *two* counts of assault. For some unexplained reason, it chose not to do so. There was only one unauthorized entry here, not two. The District Court therefore erred in refusing to dismiss one of the two counts of aggravated burglary. Because we reverse the District Court for failing to dismiss one count of aggravated burglary, we need not determine whether DeWitt's consecutive sentences on two counts of aggravated burglary implicate double jeopardy.

¶46   DeWitt next claims that his counsel was ineffective for failing to file pretrial motions to dismiss the defective information. He also claims the District Court erred in denying his request for new counsel at the sentencing hearing. It in unnecessary that we engage in a lengthy analysis of DeWitt's claims that his counsel was ineffective. Our review of the record shows that DeWitt's attorney zealously advocated on behalf of his client throughout the proceeding. There appears no evidence that counsel's performance was deficient; in fact, counsel made several apparently strategic decisions to the benefit of his client. *See Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

¶47   Lastly, DeWitt claims that the District Court erred in failing to conduct a *Finley* hearing when DeWitt requested new counsel at the sentencing hearing. However, because we are remanding this matter for re-sentencing, we conclude it is unnecessary to reach this issue.

## CONCLUSION

16

¶48     For the foregoing reasons, we reverse the District Court's refusal to dismiss one count of aggravated burglary. We remand for dismissal of this charge and for re-sentencing. We affirm the District Court on all other issues.

/S/ PATRICIA O. COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON
/S/ JOHN WARNER

17