JUSTICE RICE
dissenting.
¶73 I respectfully dissent. I appreciate the Court’s effort in analyzing this issue of first impression, but, in my view, the Court has overlooked or failed to emphasize superior precedent which would require a different outcome when applied to the facts here. Although discussing the United States Supreme Court’s decisions in Wilson and Richards at some length, the Court makes only a single, passing reference to each of the Supreme Court’s two most recent decisions regarding this issue, United States v. Ramirez and United States v. Banks.[1] The Court appears to have eschewed these holdings in favor of holdings from other state courts and United States Circuit Court decisions, particularly the Ninth Circuit. Though I take no issue with citing to the Ninth Circuit generally, it bears mention, and consideration, that the Ninth Circuit Court’s analytical approach to this issue has been criticized and its holdings have been overruled by the high court. The *268 Supreme Court has provided instruction that I would apply to this case.
¶74 I begin with the standard of review. The Court cites to the Ninth Circuit Court’s holding in United States v. Furrow for the proposition that de novo review is exercised on search warrant exigency issues. See ¶ 18. Furrow did not establish that standard, but simply restated the standard which, after analysis, had been adopted by the Ninth Circuit in United States v. McConney (9th Cir. 1984), 728 F.2d 1195. Furrow, 229 F.3d at 811. A review of McConney’s holding reveals that the Ninth Circuit’s de novo standard is significantly different than the de novo review we have previously exercised. Beginning with our Court, we have held:
We review a district court’s denial of a motion to suppress “to determine whether the court’s findings of fact are clearly erroneous and whether its interpretation and application of the law are correct.” State v. Meyer, 2004 MT 272, 323 Mont. 173, 99 P.3d 185.
State v. DeWitt, 2004 MT 317, ¶ 21, 324 Mont. 39, ¶ 21, 101 P.3d 277, ¶ 21. Further, regarding exigent circumstances, we have held:
Whether the factual circumstances determined by a district court constitute exigent circumstances is a conclusion of law reviewed for correctness. State v. Saxton, 2003 MT 105, ¶ 19, 315 Mont. 315, ¶ 19, 68 P.3d 721, ¶ 19.
State v. Lanegan, 2004 MT 134, ¶ 11, 321 Mont. 349, ¶ 11, 91 P.3d 578, ¶11.
¶75 The Ninth Circuit’s “de novo review,” as adopted in McConney and reiterated in Furrow, is something quite different than our Court’s review “anew” of the trial court’s conclusions of law for correctness. The Ninth Circuit’s review is premised on its determination that exigent circumstances questions are mixed questions of law and fact. Its analysis, in part, is as follows:
In summary, to classify mixed questions of law and fact for standard of review purposes, we adopt a functional analysis that focuses on the nature of the inquiry required when we apply the relevant rule of law to the facts as established. The analysis is not a precise one and does not offer any litmus test by which all mixed questions can be neatly categorized. It does not “unerringly distinguish between findings of fact and conclusions of law.” Pullman-Standard v. Swint, 456 U.S. at 289 n.19, 102 S.Ct. at 1790 n.19. Nonetheless, we think that if we focus on the nature of the inquiry required in determining whether the established facts *269 fall within the relevant legal definition, we employ a neutral test that accurately reflects the concerns that properly underlie standard of review jurisprudence.
Ill
Applying our functional analysis to the case at hand, we conclude that the mixed question of exigent circumstances is reviewable de novo as a question of law, and, consequently, we overrule Flickinger. Our reason is this: to decide if the facts satisfy the legal test of exigency-whether, judged by an objective standard, “there [was] a likelihood that the occupants [would] attempt to escape, resist, destroy evidence, or harm someone within,” United States v. Bustamante-Gamez, 488 F.2d 4, 12 (9th Cir. 1973), cert. denied, 416 U.S. 970, 40 L.Ed.2d 559 (1974),-necessarily involves us in an inquiry that goes beyond the historical facts.
The mixed question of exigency is rooted in constitutional principles and policies. Like many such mixed questions, its resolution requires us to consider abstract legal doctrines, to weigh underlying policy considerations, and to balance competing legal interests. In particular, its resolution requires that we strike a balance between two sometimes conflicting societal values- the safety of law enforcement officers and fourth amendment privacy interests. The essential and difficult question raised by this balancing is how much risk police officers can reasonably be expected to assume before disregarding the rules society has adopted to otherwise circumscribe the exercise of their considerable discretionary authority in carrying out their vital law enforcement duties.
This is a question that no amount of fact-finding will answer. The inquiry requires us to ask not merely whether the trial judge was correct in finding that Olson in fact had reason to believe, for instance, that McConney was a member of the Hell’s Angels Motorcycle Club or that he had a prior felony conviction; it also requires a determination whether these facts and any other information Olson had about McConney’s past are sufficient to satisfy the legal standard for exigency. We must decide, for instance, whether a reasonable belief that a suspect is a member of the Hell’s Angels Club, without demonstration of a link to criminal activity, is relevant to the issue of exigency, cf. United States v. Rubio, 727 F.2d 786 at 793 (9th Cir. 1983) (membership in Hell’s Angels without a link to actual criminal activity *270 insufficient to support a finding of probable cause to issue a search warrant). We must also decide how much weight may be given to an officer’s knowledge that a suspect has previously been convicted of an unspecified felony.
When, as here, the application of law to fact requires us to make value judgments about the law and its policy underpinnings, and when, as here, the application of law to fact is of clear precedential importance, the policy reasons for de novo review are satisfied and we should not hesitate to review the district judge’s determination independently.
In conclusion, we hold that the mixed question of exigent circumstances is not reviewable under the clearly erroneous test because it is not, like the question of intent, essentially factual. We do not at this juncture decide how any other mixed question should be reviewed. We do, it is true, adopt a functional analysis for the resolution of these questions. But our approach is an ad hoc one, permitting individual analysis and classification of each type of mixed question. Under it, we need only decide that the question of exigent circumstances is subject to de novo review.
McConney, 728 F.2d at 1204-05.
¶76 Rather than import the Ninth Circuit’s “mixed question” analysis, and all that comes with it, I would retain our previously applied de novo review of warrant exigency questions- that is, approaching the issue as a legal conclusion reviewed for correctness and exercising deferential review on related factual questions, as we stated in Lanegan and DeWitt.
¶77 Turning to the merits, the Court correctly notes that the “no-knock” rule adopted by the United States Supreme Court in Richards is a “flexible one,” and that courts must determine whether an unannounced entry is reasonable under the particular circumstances of each case. However, the Court then concludes that, under the facts here, officers violated the defendants’ federal and state constitutional rights by failing to knock and announce. See ¶¶ 64-65. In this regard, I will begin by discussing amplifications of the Richards rule which have been announced, believing these to be necessary for proper resolution of the issue.
¶78 First, Richards held that, although police should be required to make the necessary showing whenever the reasonableness of a no-knock entry is challenged, the showing itself is “not high.” Richards, 520 U.S. at 394-95; see also United States v. Diehl (1st Cir. 2002), 276 F.3d 32, 44, cert. denied, Diehl v. United States (2002), 537 U.S. 834, *271 123 S.Ct. 193, 154 L.Ed.2d 52 (“This burden is not large and the version of the record favoring the trial court’s ruling governs.”). Further, it is not necessary to establish a level of proof satisfying the probable cause standard. Richards, 520 U.S. at 394; see also United States v. Grogins (4th Cir. 1998), 163 F.3d 795, 797 (reversing the district court’s suppression of evidence because “the district court’s scrutiny approximated, if it did not exceed, the probable cause standard. The Supreme Court has expressly rejected this standard with respect to forgoing knocking and announcing” and citing Richards.)
¶79 Indeed, the Richards “reasonable suspicion” standard is the same standard applied for the reasonableness of an investigative stop. Richards, 520 U.S. at 394 (citing the Terry v. Ohio (1968), 392 U.S.l, 88 S.Ct. 1868, 20 L.Ed.2d 889, stop and frisk standard); see also United States v. Banks (2003), 540 U.S. 31, 42, 124 S.Ct. 521, 528, 157 L.Ed.2d 343, 355-56 (in knock and announce case, applying investigative stop principles from United States v. Arvizu (2002), 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740). Thus, the showing necessary for officers to initiate an investigative stop, a standard well established by our myriad of cases addressing that issue, is the standard we are to apply here. That standard provides helpful illustration about the kind and amount of information required to justify the officers’ no-knock entry. ¶80 “Whether particularized suspicion supports an investigative stop is a question of fact that is analyzed in the context of the totality of the circumstances.” State v. Martinez, 2003 MT 65, ¶ 23, 314 Mont. 434, ¶ 23, 67 P.3d 207, ¶ 23 (citing State v. Pratt (1997), 286 Mont. 156, 161, 951 P.2d 37, 40). “[I]n order for the State to prove the existence of particularized suspicion, the State must show: (1) objective data from which an experienced officer can make certain inferences; and (2) a resulting suspicion that the occupant of a certain vehicle is or has been engaged in wrongdoing or was a witness to criminal activity.” State v. Gopher (1981), 193 Mont. 189, 194, 631 P.2d 293, 296. The Richards rule is consistent herewith, thereby satisfying both federal and state constitutional requirements: “In order to satisfy a ‘no-knock’ entry, police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence.” Richards, 520 U.S. at 394 (emphasis added); see also Ramirez, 523 U.S. at 70. With these standards in mind, I turn to the circumstances of this case.
*272 ¶81 1. Nature of the crime investigated. Citing to Richards’ holding that there can be no “blanket exceptions” to the knock-and-announce rule for felony drug investigations, the Court simply dismisses the nature of the crime here as irrelevant to the inquiry. See ¶ 39. This is an incorrect application of Richards, which also concluded that “[i]t is indisputable that felony drug investigations may frequently involve both” the threat of physical violence and the likelihood of destruction of evidence, and cited its previous discussions about these connections. Richards, 520 U.S. at 391. Richards merely concluded that this connection could not justify a blanket exception to the knock-and-announce rule that would alleviate case-by-case evaluation. Richards, 520 U.S. at 391-92. However, contrary to this Court’s analysis, the nature of the crime being investigated is nonetheless a key factor which must be considered by police. “‘[T]he law has uniformly recognized that substantial dealers in narcotics possess firearms’ and that ‘entrance into a situs of drug trafficking activity carries all too real dangers to law enforcement officers.’” United States v. Kennedy (4th Cir. 1994), 32 F.3d 876, 882 (citing United States v. Bonner (D.C. Cir. 1989), 874 F.2d 822, 824). In Banks, the Supreme Court recognized that the police’s approach to a house to execute a search warrant for cocaine may differ from their approach with a warrant for a stolen piano. “Police seeking a stolen piano may be able to spend more time to make sure they really need the battering ram.” Banks, 540 U.S. at 41.
¶82 Here, police were not seeking a stolen piano. They were executing a felony drug warrant. The Court fails to consider this distinction, but more, also dismisses the significance of the kind of drugs involved here-a methamphetamine laboratory. The Court should well know by now that “meth labs” are inherently unstable and dangerous, presenting this additional danger to officers. Nonetheless, the Court concludes this factor is not relevant to the inquiry because police “made no attempt to evacuate any residences.” See ¶ 48. Unfortunately, the dismissal of this concern by the Court does not accurately reflect the evidence in the record. To the contrary, Officer Bardwell testified that the situation here-“a meth lab with multiple suspects and they had warrants’-weighed significantly in his mind. The District Court specifically found that “a methamphetamine laboratory was in the residence to be searched, which presented a high hazard level.” The Court improperly concludes this evidence has no bearing-on the basis of its own evaluation.
¶83 2. Purchase of ammunition by Klein. Citing authority for the *273 proposition that “[e]vidence that firearms are within the residence or that a particular defendant is armed is not by itself sufficient to create an exigency,” see ¶ 44 (emphasis added), the Court dismisses the evidence of Klein’s ammunition purchase as insufficient to constitute exigency. I do not disagree with the cited authority, only the Court’s application of it. Klein’s ammunition purchase may by itself have been insufficient to establish an exigency, but that did not render this evidence irrelevant to the inquiry. The Court reasons as if the evidence did not exist or was completely inconsequential. To the contrary, Officer Bardwell testified that evidence of the ammunition purchase by Klein, a fugitive felon, was significant to his analysis, and the District Court found this fact to be significant.
¶84 The Court rejects the District Court’s finding, and instead engages in a “no existence” analysis; that is, it repeatedly focuses on the evidence which the police did not have, a tactic the Court uses throughout the opinion. See also ¶ 50. Here, because the police had “no information” about whether the occupants were armed and “no information” about weapons being in the house, the Court concludes that the ammunition purchase by Klein is simply immaterial. See ¶ 45. This is a faulty inquiry. The proper focus in determining reasonable suspicion is what police did observe, and whether “an experienced police officer can make certain inferences” therefrom. Gopher, 193 Mont. at 194, 631 P.2d at 296. Thus, I disagree with the Court’s conclusion about this evidence. Purchase of ammunition by a fugitive felon who is associating with a group operating a meth lab is not a “mere unspecific fear,” see ¶ 43, and this is another fact that should be properly considered.
¶85 3. The video surveillance camera. Under the opinion’s section entitled “Futility,”[2] the Court discards the evidence regarding the surveillance camera because “Sergeant Bardwell testified that the presence of the surveillance camera was not a consideration in planning the no-knock raid, since the speed of entry would undermine the effectiveness of any surveillance.” See ¶ 55. Here, the Court illogically reasons that because the surveillance camera would be rendered ineffective by the speed of the no-knock entry, the camera was therefore not a factor to be considered in justifying the no-knock entry. Obviously, the camera would not have been rendered ineffective but for the no-knock entry. In addition to this error in logic, the Court *274 again critically misapprehends Officer Bardwell’s testimony. Officer Bardwell offered testimony to the precisely opposite conclusion about the significance of the surveillance camera:
Defense: When you were planning the raid did you take the surveillance camera into consideration?
Bardwell: When we did the raid; absolutely.
Defense: When you were planning the raid did you plan around that surveillance camera?
Bardwell: Not about any particular camera. We planned our raid, or considerations on the raid, that they had counter-surveillance, whether they had one camera or two cameras.
Defense: Okay. So it really didn’t matter, then, in planning the raid that the surveillance cameras were there.
Bardwell: Oh, it mattered a lot; yeah.
Defense: How did it matter in terms of planning your raid?
Bardwell: That if they have an operation that they deem the expense and trouble to put up counter-surveillance, its probably a pretty substantial operation that they have.
Defense: Did that fact have any bearing on your decision to make a no-knock entry in this case?
Bardwell: Actually it was a great deal.
Defense: It did.
Bardwell: Yes.
From this testimony, the District Court found that the presence of the camera was significant and indicated a substantial drug operation was inside the house. The Court simply disregards this evidence as worthless.
¶86 4. The number of suspects in the house and their criminal backgrounds. The Court focuses too narrowly on this issue, merely noting that Klein was “the only person about whom Sergeant Bardwell had any information prior to the raid” and discussing only Klein. See ¶ 46. More accurately, Klein was the only person that Bardwell had noted on a risk assessment form prepared shortly before the raid, but, in any event, that was not the extent of the investigation. Other suspects were also investigated by officers. Officer Nichols’ pre-entry investigation had revealed that the house was occupied by as many as fifteen individuals, including suspects with previous charges for carrying a concealed weapon, domestic assault, felony assault, and child rape. Another individual had been charged with four instances of domestic assault and a weapon violation, while still another had *275 previously been charged with intimidation with a weapon, unlawful domestic imprisonment, and interference with domestic violence reporting. Information about the group was shared with Bardwell, and although he was not advised of all the prior charges, he was aware of the criminal involvement. This is significant evidence in support of a no-knock entry which the Court completely overlooks. Obviously, the suspects had a history of violence. Further, the number of suspects in the house, finally thought to be between six and eight at the time of the raid, raised concerns about officer safety and possible escape that led officers to pursue a no-knock entry.
¶87 5. Other factors. The evidence indicated various other factors considered by officers in deciding that a no-knock entry was necessary. One was that the house was a three-story structure with numerous rooms. Police expressed concern about timely securing such a large structure, particularly in light of the number of suspects. Another was the pre-raid incident when one of the suspects yelled for everyone to get inside and turn off the lights, which prompted officers to move up the timing of the entry.
¶88 Additional factors could be analyzed, but this is enough. Clearly, there were specifically identifiable, objective factors which indicated to police that the situation required a no-knock entry. However, the Court, engaging in a “divide and conquer” analysis, systematically eliminates the effect of each factor. This is precisely the kind of analysis which the United States Supreme Court criticized when reversing the Ninth Circuit Court in Banks. The Court first recalled its holding in Arvizu, where it stated:
We think that the approach taken by the [Ninth Circuit] Court of Appeals here departs sharply from [our] cases. The court’s evaluation and rejection of seven of the listed [evidentiary] factors in isolation from each other does not take into account the “totality of the circumstances,” as our cases have understood that phrase. The court appeared to believe that each observation by [the officer] that was by itself readily susceptible to an innocent explanation was entitled to ‘no weight.’ [Citation omitted.] Terry, however, precludes this sort of divide-and-conquer analysis.
Arvizu, 534 U.S. at 274. The Banks Court then faulted the Ninth Circuit for failing to consider Arvizu in again systematically eliminating the factors offered by police in support of a no-knock entry:
Nor did the appeals court cite United States v. Arvizu, 534 U.S. 266, 151 L.Ed.2d 740, 122 S. Ct. 744 (2002) (again, from the Ninth Circuit). There, we recently disapproved a framework for making *276 reasonable suspicion determinations ... by “describ[ing] and clearly delimiting]” an officer’s consideration of certain factors [citation omitted]. Here, as in Arvizu, the Court of Appeals’s overlay of a categorical scheme on the general reasonableness analysis threatens to distort the “totality of the circumstances” principle, by replacing a stress on revealing facts with resort to pigeonholes.
Banks, 540 U.S. at 42.
¶89 The Court here employs the same flawed analysis. It has proposed a “categorical scheme” which separates and pigeonholes the factors which the police here considered, thereby eliminating all of them. In effect, it has taken the “totality” out of “totality of the circumstances.” ¶90 Police here were faced with executing a felony drug warrant in a large structure in which numerous suspects with violent criminal backgrounds were staying. One suspect was known to have purchased ammunition. The suspects had mounted a surveillance camera. A meth lab was housed in the structure, and the size of the structure would inhibit the ability of police to locate and secure the lab. The numbers of suspects known to be inside could present safety and escape concerns. Shortly before the raid, one suspect yelled suspiciously. From a consideration of the totality of these circumstances, I would conclude that police had objective data from which they could reasonably infer, and from which a reasonable suspicion would arise, that a no-knock entry was necessary.
¶91 Although I concur with the new rule adopted by the Court regarding a magistrate’s approval of a no-knock entry, this procedure will not always resolve the issue. Circumstances may arise following the magistrate’s issuance of a warrant which may require a last minute, unapproved no-knock entry, as the Supreme Court has recognized:
When a warrant applicant gives reasonable grounds to expect futility or to suspect that one or another such exigency already exists or will arise instantly upon knocking, a magistrate judge is acting within the Constitution to authorize a “no-knock” entry. And even when executing a warrant silent about that, if circumstances support a reasonable suspicion of exigency when the officers arrive at the door, they may go straight in.
Banks, 540 U.S. at 36-37.1 would so note in the opinion.
¶92 Further, I would affirm the District Court.
CHIEF JUSTICE GRAY and JUSTICE WARNER join in the dissent of JUSTICE RICE.

 Banks dealt with a forceful entry by police some fifteen to twenty seconds following their “knock and announce.” The Court stated that the “same criteria bear on when the officers could legitimately enter after knocking” as those for “dispensing with a knock and announcement” altogether. Banks, 540 U.S. at 35.

 The United States Supreme Court analyzes “futility” as a separate basis for a no-knock entry, not as a subcategory of exigency. See Banks, 540 U.S. at 37 n.3.