No. 05-517

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 217

_____

DAN CASSADY,

              Plaintiff and Appellant,

     v.

YELLOWSTONE COUNTY MONTANA SHERIFF
DEPARTMENT, a Political Subdivision; SERGEANT
VINCE WALLIS, an individual; LIEUTENANT MIKE
SCHIENO, an individual; DEPUTY SHANE SKILLEN,
an individual; and DEPUTY BRENT WEGNER, an
individual.

              Defendants and Respondents.

_____

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                    In and for the County of Yellowstone, Cause No. DV 04-0160
                    The Honorable Susan Watters, Judge presiding.

COUNSEL OF RECORD:

       For Appellant:

           W. Scott Green (argued), Patten, Peterman, Bekkadahl & Green, PLLC,
           Billings, Montana

       For Respondents:

           Kevin Gillen (argued) and Ryan Nordlund, Deputy Yellowstone County
           Attorneys, Billings, Montana

_____

Argued:  May 1, 2006
Submitted:  May 10, 2006
Decided:  September 6, 2006

Filed:

_____
                  Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Plaintiff Dan Cassady (Cassady) brought a 42 U.S.C. § 1983 (§ 1983) claim against Yellowstone County Sheriff's Department, and officers Deputy Shane Skillen, Deputy Brent Wegner, Sergeant Vince Wallis, and Lieutenant Mike Schieno (collectively the Officers), in their individual capacities. The claim alleged civil rights violations stemming from the Officers' failure to knock and announce their presence before entering Cassady's home, and the Officers' alleged excessive use of force against Cassady. The Thirteenth Judicial District Court, Yellowstone County, determined as a matter of law that the Officers were entitled to qualified immunity. Cassady appeals.

¶2 We consider the following issues on appeal:

¶3 1) Did the District Court commit error when it granted the Officers qualified immunity from Cassady's § 1983 claim based on the Officers' failure to knock and announce their presence?

¶4 2) Did the District Court commit error when it determined that the Officers did not use excessive force and, consequently, were entitled to qualified immunity from Cassady's § 1983 claim?

FACTS AND PROCEDURAL HISTORY

¶5 What began as a violent incident between father and son one evening in Broadview, Montana, ended the next morning with a SWAT team firing tear gas to remove a shooting victim from his own home.

¶6 Cassady and his then seventeen-year old son, Robert Cassady (RJ), lived in the back portion of a building in which Cassady also operated the Broadview Bar, in

2

Yellowstone County. Cassady and RJ initially argued on the evening of May 8, 2001, before the incident escalated into physical violence. RJ retreated to the house of his friend and neighbor, Robert Conover (Conover), after the fight. RJ told Conover that the altercation ended when he had hit his father repeatedly over the head with a baseball bat, and that he did not know whether Cassady was dead or alive. Cassady's blood soaked RJ's pants. Conover, a first responder, drove to Tim Hancock's (Hancock) house and requested Hancock accompany him to the Broadview Bar to check on Cassady's welfare. Conover and Hancock entered the building and announced their presence. They found Cassady talking on the phone. Conover inquired whether Cassady was all right, and Cassady responded, "I'm walking, I'm talking, that's all, does it look like I'm all right?" Cassady then ordered the men to leave the premises. They complied.

¶7 Conover returned home and called 911. He informed the police what he knew of the evening's events, including Hancock's observation that he saw a shotgun in Cassady's home. Deputy Skillen, Deputy Wegner, and Sergeant Wallis of the Yellowstone County Sheriff's Department arrived at Conover's home. The Officers interviewed Conover and RJ and learned that Cassady had sustained head injuries from a baseball bat and that he had been drinking alcohol. Dispatch also informed the Officers that Cassady had a "history of gunplay." The Officers stated that they proceeded to the Cassady residence to check on Cassady's medical status and investigate further the circumstances surrounding the incident with RJ.

¶8 Dispatch called Conover after the Officers left to ask if Conover had a key to the Cassady residence. RJ provided Conover a key to his home for the Officers' use. RJ told

Conover to inform the Officers that they needed to announce themselves when they entered the bar or else his father would think that they were burglars. Lieutenant Schieno, also of the Yellowstone County Sherriff's Department, appeared at the Conover residence. Conover met him outside and gave him RJ's key. Officer Schieno asked Conover twice if the Officers had RJ's permission to enter the home. Conover confirmed that the Officers did have RJ's permission to enter his home. Conover neglected, however, to relay RJ's warning that the Officers needed to announce themselves.

¶9 The Officers arrived at the Cassady residence and requested that dispatch call Cassady and ask him to come outside to discuss what had happened with his son. Dispatch called Cassady twice. He did not answer the phone. Conover's wife, Ann, testified later that Cassady was talking to her on the phone intermittently during these hours.

¶10 The parties dispute what happened next. Three of the four Officers' affidavits state that they shined flashlights in the windows and announced themselves as law enforcement while they walked the building's perimeter. One of these Officer's taped statements, taken the morning after the incident, included this information. Cassady's affidavit contains no mention of flashlights or announcements coming from outside his home. Cassady's affidavit states that he had retired to his residence when he "heard intruders enter the bar."

¶11 The Officers had decided to enter the building through the front door with their weapons drawn. Officer Schieno used the front door key provided by Conover, discovered that turning the key had actually locked the door, and unlocked it again. The

4

Officers did not knock or announce their presence as they entered through the front door. The Officers' taped statements and affidavits consistently relayed that the group entered the building "very quietly," and were making a conscious effort to do so.

¶12    The room where the Officers entered was dark. Deputies Skillen and Wegner proceeded to the right, while Lieutenant Schieno and Sergeant Wallis moved to the left. Wallis and Schieno immediately noticed a laser light targeted on Schieno's face. The Officers knew the laser to be consistent with a gun sight device. What Officers described as "lots of verbalization" occurred during the next few moments. The Officers announced repeatedly and loudly that they were the Sheriff's Department, and continually ordered Cassady to drop his weapon. Cassady ignored the Officers' demands and maintained the laser sight on Schieno. Wallis fired his gun in Cassady's direction.

¶13    The Officers then retreated from the building. When Cassady did not emerge, they established a perimeter and medical staging area outside the building. Law enforcement's attempts to communicate with Cassady and convince him to leave the building throughout the night were unsuccessful. The Yellowstone County SWAT team eventually shot tear gas into the residence around five o'clock the next morning. Cassady emerged, and law enforcement transported him to a local hospital where he received treatment for a gunshot wound to his abdomen, for a bullet fragment in his upper right chest, and for multiple injuries he sustained from the encounter with his son. Law enforcement transferred Cassady again later in the day to the Yellowstone County Detention Facility. They charged him with felony assault on a peace officer and family partner member assault.

5

¶14 Cassady entered a plea of not guilty on both charges. He did not pay the $200,000 bail and remained in the county jail. Cassady moved the court to reduce his bail to $50,000 on August 27, 2001, after serving 110 days in jail. The court granted his motion. Cassady posted bail and the court set trial for January 22, 2002. The State dismissed the partner family member assault charge immediately preceding trial. The jury found Cassady not guilty of felony assault on a peace officer following a four-day trial.

¶15 Cassady then brought a civil action against Yellowstone County and the Officers. The action included a § 1983 claim that stated generally that the defendants "violated plaintiff's civil rights and deprived him of his rights under 42 U.S.C. § 1983." The District Court analyzed the § 1983 claim under both the United States Constitution and Montana case law. Cassady's complaint also claimed that the Officers committed various other torts against him.

¶16 The court granted the Officers' summary judgment motion to dismiss some of the tort claims, and granted the Officers qualified immunity for the § 1983 claim. Cassady's claims for negligence, assault, and negligent infliction of emotional distress proceeded to a four-day trial. The jury issued a defense verdict. Cassady now appeals the order granting qualified immunity to the Officers for the § 1983 claim based on the alleged constitutional violations arising from the Officers' failure to knock and announce and their alleged use of excessive force.

STANDARD OF REVIEW

¶17 We review *de novo* a district court's decision to grant qualified immunity. *Losleben v. Oppedahl*, 2004 MT 5, ¶ 13, 319 Mont. 269, ¶ 13, 83 P.3d 1271, ¶ 13. We

also review *de novo* the issue of whether exigent circumstances exist. *State v. Anyan*, 2004 MT 395, ¶ 18, 325 Mont. 245, ¶ 18, 104 P.3d 511, ¶ 18 (citing *United States v. Furrow* (9th Cir. 2001), 256 F.3d 805, 811).

## DISCUSSION

¶18 Qualified immunity is "an *immunity from suit* rather than a mere defense to liability," and, consequently, "it is effectively lost if a case is erroneously permitted to go to trial." *Saucier v. Katz* (2001), 533 U.S. 194, 200-01, 121 S.Ct. 2151, 2155-56, 150 L.Ed.2d 272. Qualified immunity seeks to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Saucier*, 533 U.S. at 202, 121 S.Ct. at 2156. Thus, the court must engage in a two-part test to determine whether government officials are entitled to qualified immunity for a claim brought pursuant to § 1983, so that the issue of immunity can be resolved "at the earliest possible stage in litigation." *Saucier*, 533 U.S. at 201, 121 S.Ct. at 2156, (citing *Hunter v. Bryant* (1991), 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589.

¶19 The court must determine initially if, when viewed in the light most favorable to the party asserting the injury, the offending conduct violated a constitutional right. *Losleben*, ¶ 14; *Saucier*, 533 U.S. at 201, 121 S.Ct. at 2156. Only when the conduct violated plaintiff's constitutional right should the court then proceed to ask whether the constitutional right was clearly established at the time of the violation in light of the specific context of the case. *Saucier*, 533 U.S. at 201, 121 S.Ct. at 2156. If the officer's actions were objectively reasonable given the circumstances, summary judgment based on qualified immunity is appropriate. *Saucier*, 533 U.S. at 205, 121 S.Ct. at 2158.

7

¶20 Did the District Court commit error when it granted the Officers qualified immunity from Cassady's § 1983 claim based on the Officers' alleged failure to knock and announce their presence?

¶21 a) Did Officers violate Cassady's constitutional right to be free from unreasonable searches and seizures and his constitutional right to privacy when they failed to knock and announce their presence as they conducted a warrantless entry into his home with their weapons drawn?

¶22 The Officers claim that the presence of both exigent circumstances and consent obviated the knock and announce requirement and, consequently, they did not violate Cassady's constitutional rights when they entered his home unannounced. The Officers claim alternatively that if the law did in fact require them to knock and announce, they substantially complied with the rule before entering Cassady's home.

¶23 We note initially that the District Court's order states that it is "undisputed that the [Officers] failed to announce their presence prior to entry into [Cassady's] residence." The Officers' brief states, however, that they substantially complied with knock and announce when they "shouted at Cassady from outside the bar, shined flashlights in the windows, knocked on the door and had dispatch telephone Cassady repeatedly." The Officers' motion for summary judgment does not include a substantial compliance argument. As such, the Officers failed to present this theory in the District Court, and we will not consider it for the first time on appeal. *Bekkedahl v. McKittrick*, 2002 MT 250, ¶¶ 31-32, 312 Mont. 156, ¶¶ 31-32, 58 P.3d 175, ¶¶ 31-32.

¶24 In *Anyan*, we determined that law enforcement officers violated various defendants' constitutional rights to be free from unreasonable searches and seizures when

the officers failed to knock and announce their presence when executing a warrant on a drug house. *Anyan*, ¶ 2. The case represented the first time this Court considered the knock and announce rule's application in the context of criminal law. *Anyan*, ¶ 20. We recognized that concerns for privacy, reduction in the potential for violence, and preventing the destruction of private citizens' property as the underlying policies requiring law enforcement to knock and announce their presence. *Anyan*, ¶ 22.

¶25 We consequently established the rule that "an officer serving a search warrant must comply with the knock and announce requirement unless there are exigent circumstances present . . . ." *Anyan*, ¶ 33. We noted that we rendered our decision pursuant to the Fourth Amendment of the United States Constitution and federal authority, but that since Article II, Sections 10 and 11 of the Montana Constitution provide even greater privacy protections than the federal constitution, the Montana Constitution provided an independent basis for our holding that the forced entry and subsequent search were unreasonable. *Anyan*, ¶¶ 20, 61.

¶26 We must now address a situation where officers entered a private residence without a warrant and did not knock and announce their presence. In doing so, we deem the same policy considerations applicable whether law enforcement enter a home under an exception to the warrant requirement or whether officers enter armed with a warrant. We also recognize an additional policy reason for requiring law enforcement to knock and announce when they do not have a warrant that we did not articulate in *Anyan*: the occupant's opportunity to comply.

¶27 First, we deem the potential privacy violation greater where police enter a residence without a warrant because law enforcement's entry into the home is not inevitable as it is in situations where police hold a warrant. *See Richards v. Wisconsin* (1997) 520 U.S. 385, 393 n.5, 117 S.Ct. 1416, 1421 n. 5, 137 L.Ed.2d 615 (referring to the "brief interlude between announcement and entry with a warrant. . . ."); *Hudson v. Michigan* (2006), __ U.S. __, 126 S.Ct. 2159, 2006 WL 1640577 (stating that the interests protected by knock and announce "do not include the shielding of potential evidence from the government's eyes."). Further, when the police enter warrantless, the privacy interest protected by the knock and announce rule integrates with the interest in providing the occupant the opportunity to comply with the law.

¶28 In *Wilson*, 514 U.S. 927, 115 S.Ct. 1914, the Court recognized that providing individuals the opportunity to comply represented one foundation of the knock and announce requirement at common law. Common law courts required law enforcement officers to identify themselves and "make request to open doors . . . for perhaps he did not know of the process, of which, if he had notice, it is to be presumed that he would obey it . . . ." *Wilson*, 514 U.S. at 931-32, 115 S.Ct. at 1917 (citing *Semayne's Case* (K.B. 1603), 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194, 195-96). *See also Richards*, 520 U.S. at 393 n.5, 117 S.Ct. at 1421 n. 5.

¶29 The reduction in the potential for violence provides an additional policy reason that applies equally when officers enter a private residence unannounced either with or without a warrant. Expanding on the purpose of the knock and announce rule to diminish the potential for violence, we noted that unannounced breaking and entering into a home

"could quite easily lead an individual to believe that his safety was in peril and cause him to take defensive measures which he otherwise would not have taken" had he known that a warrant had been issued to search his home. *Anyan*, ¶ 23 (citing *State v. Bamber*, (Fla. 1994), 630 So.2d 1048, 1050); *See also Hudson*, __ U.S. at __, 126 S.Ct. at 2165 (stating that one of the interests in the knock and announce rule "is the protection of human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident.").

¶30 The present case represents the consummate example of when officer compliance with the knock and announce rule would address privacy concerns, provide the opportunity for the homeowner to comply with law enforcement, and also reduce the potential for violence. Officer Wallis's affidavit stated that the purpose for entry into the residence "was two-fold: first, a welfare check was in order due to the reports of injury and our inability to communicate with Dan Cassady and, second, to further the investigation into the altercation." Officer compliance with knock and announce would have afforded Cassady the opportunity to answer the door, and simultaneously provided the Officers the opportunity to accomplish peacefully the purposes of their presence at his home. In fact, law enforcement may never have had to enter his home and invade his privacy at all.

¶31 In light of this reasoning, we conclude that an officer must comply with the knock and announce requirement when he or she enters a home without a warrant unless exigent circumstances exist that would present a threat of physical violence or the likelihood that evidence would be destroyed. *See Anyan*, ¶ 33. Exigent circumstances to justify a

11

warrantless entry, however, may not always obviate the knock and announce requirement. Law enforcement and courts still must evaluate the circumstances in each situation on a case by case basis, adhering to the "flexible requirement of reasonableness" implicated whenever law enforcement interests are present. *Wilson*, 514 U.S. at 934, 115 S.Ct. at 1918.

¶32 We turn now to the issue of whether exigent circumstances obviated the knock and announce requirement under the present circumstances. The government bears the burden of proving that exigent circumstances existed, and an "unjustified yet sincere belief in exigent circumstances does not justify non-compliance with the knock and announce rule." *Anyan*, ¶ 34. We have applied the same definition of exigent circumstances to warrantless entries as we have to exceptions to the knock and announce rule. *Compare Anyan*, ¶ 34 (defining exigent circumstances serving as exceptions to the knock and announce rule), *with State v. Saxton*, 2003 MT 105, ¶ 26, 315 Mont. 315, ¶ 26, 68 P.3d 721, ¶ 26 (defining exigent circumstances serving as exceptions to the warrant requirement in addition to probable cause).

¶33 Exigent circumstances are those circumstances that "would cause a reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent physical harm to the officers or other person, the destruction of relevant evidence, the escape of a suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *Anyan*, ¶ 34. The Officers here never have asserted a concern that Cassady would escape, destroy relevant evidence, or otherwise frustrate their efforts. Officer safety then remains the sole potential exigent circumstance.

12

¶34 Although "peril to officers may well demonstrate an exigency, mere unspecified fears about that possibility will not." *Anyan*, ¶ 43. Even if the officers have actual knowledge that firearms are within a residence, such information standing alone is insufficient to create an exigency. *Anyan*, ¶ 44. Nonetheless, a criminal record reflecting violent tendencies, or a verified reputation of a suspect's violent nature can be sufficient information to forego knock and announce procedures. *Anyan*, ¶ 44. And most importantly, courts must consider the totality of the circumstances when analyzing a knock and announce case involving exigent circumstances. For example, in *Richards*, 520 U.S. at 395, 117 S.Ct. at 1422, the Court rejected Wisconsin's blanket exception to the knock and announce requirement in felony drug cases, despite the fact that the cases customarily present exigent circumstances. The Court rendered it the courts' duty to "determine whether the facts and circumstances of the particular entry justified dispensing with the knock-and-announce requirement." *Richards*, 520 U.S. at 395, 117 S.Ct. at 1422.

¶35 Thus, the knowledge that Cassady had a shotgun inside his home—standing alone—does not justify Officers' noncompliance with the knock and announce rule. *Anyan*, ¶ 44. Dispatch had informed the Officers, however, that Cassady had a "history of gunplay." The Officers learned further details of Cassady's gunplay history when Conover told them that Cassady had shot at teenagers peering in the windows of his bar. On the other hand, Officers also knew that Cassady had not threatened Conover and Hancock when they had checked on him earlier in the evening, and that Cassady had no record of threatening law enforcement. Finally, the Officers reported that the purposes of

13

their visit to Cassady's home were to conduct both a welfare check and to question him about the fight with his son. Neither task inherently triggers a concern for officer safety.

¶36 We must view the facts alleged in the light most favorable to Cassady. Taking the facts alleged and the law together, we must assess the situation faced by the Officers. In considering the totality of these circumstances, we conclude that any possibility of Cassady demonstrating violence against the Officers did not rise to the level of relieving the Officers of their constitutional duty to knock and announce their presence. The Officers failed to carry the burden that exigent circumstances obviated the necessity to knock and announce in the circumstances of the present case.

¶37 The Officers also argue that the consent RJ granted them to enter the home rendered compliance with the knock and announce rule unnecessary. The Officers cite *U.S. v. Hatfield* (4th Cir. 2004), 365 F.3d 332, in support of this argument. We note initially that the Fourth Circuit applied the federal constitution in *Hatfield*, and that the Montana Constitution provides additional privacy protections not found in the federal constitution. *See* Article II, §§ 10, 11, Mont. Const.; *Anyan*, ¶ 61. Moreover, the circumstances in *Hatfield* are distinguishable from the present case.

¶38 In *Hatfield*, the court reviewed an order suppressing evidence authorities gathered when they appeared at Hatfield's house to serve a state felony warrant for his arrest and knocked, but did not identify themselves as law enforcement. *Hatfield,* 365 F.3d at 334. Hatfield, from inside his home, voluntarily responded to the knock at the door with "[t]he door is open; come on in." *Hatfield,* 365 F.3d at 340. The reviewing court concluded

14

that Hatfield's consent eliminated any Fourth Amendment violations with regard to the officers' entry into his home. *Hatfield,* 365 F.3d at 340-41.

¶39 We consider the fact that RJ had provided his consent, indirectly through Conover, while he was at Conover's house down the road, rather than from inside the home, as significant in the instant case. Consent granted from a person not physically present in the home that law enforcement seek to enter does not fulfill the purposes of the knock and announce requirement. RJ's consent did not render Cassady aware that law enforcement was on his property, that he was not in peril, and that he did not need to take defensive measures that he otherwise may not have taken. *See Anyan*, ¶ 23. This Court has never held—nor do we now—that consent given that may serve as an exception to the warrant requirement automatically renders compliance with the knock and announce rule unnecessary. Thus, the Officers' "damned if they did [enter], damned if they didn't [enter]" argument promulgated during oral argument confuses the method of entry with the legality of the entry.

¶40 Moreover, RJ qualified any consent he gave, indirectly through Conover, with his advice that Conover warn any of the Officers entering the home to "make sure that you announce yourself when you go in the door . . . or dad will think it's a burglar." RJ did not consent to the activity here—law enforcement's stealth entry into Cassady's home without informing Cassady of their identity and purpose. We reject the Officers' argument that the indirect consent that they received from RJ before entering the home alleviated the Officers' duty to knock and announce under the present circumstances.

15

¶41　The Officers here had every opportunity to identify themselves and request entry. In light of our decision in *Anyan,* the enhanced privacy rights in Sections 10 and 11 of the Montana Constitution, the lack of exigent circumstances, lack of a warrant, and the Officers' failed consent argument, we conclude that the Officers violated Cassady's constitutional rights under the Fourth Amendment of the United States Constitution when they entered his home without announcing their presence.　As we noted in *Anyan*, however, Article II, Sections 10 and 11 of the Montana Constitution provide even greater privacy protections than the federal constitution, and consequently, the Montana Constitution serves as an independent basis for our holding.　*See Anyan*, ¶¶ 20, 61.　This conclusion, however, does not end our analysis.　We now turn to the issue of whether the Officers' failure to knock and announce was reasonable for purposes of determining qualified immunity.

¶42　b)　Was the knock and announce rule clearly established in the context of the situation the Officers confronted when entering Cassady's home?

¶43　A constitutional right is clearly established if it would be clear to a reasonable officer that his or her conduct was unlawful in the situation he or she confronted. *Saucier*, 533 U.S. at 202, 121 S.Ct. at 2156.　The Officers conceded at oral argument that the Supreme Court's decision in *Wilson*, 514 U.S. 927, 115 S.Ct. 1914, had clearly established knock and announce.　We must examine the Officers' conduct in light of the circumstances the Officers confronted specifically in Broadview on May 8, 2001, however, and not "as a broad general proposition." *Saucier*, 533 U.S. at 201, 121 S.Ct. at 2156.　And although an "unjustified yet sincere belief in exigent circumstances does not

16

justify non-compliance with the knock and announce rule," *Anyan*, ¶ 44, the same principle does not apply for the purpose of analyzing the second prong of qualified immunity. A sincere but unjustified belief would entitle officers to qualified immunity in light of the fact that law enforcement may make "reasonable mistakes as to the legality of their actions" and still enjoy qualified immunity. *Saucier*, 533 U.S. at 206, 121 S.Ct. at 2159.

¶44 An array of factors culminated in Broadview that evening that could have led reasonable officers to mistakenly believe that compliance with the knock and announce rule was unnecessary. These factors include Cassady's unresponsiveness when the Officers attempted to contact him, and RJ's indirect permission to enter the home.

¶45 The Officers did not know Cassady's exact medical status by the time they arrived at his home, but they did know that he had sustained significant blood loss from the blows RJ had inflicted with the baseball bat. Cassady failed to answer phone calls that dispatch placed to his home, and he did not emerge from the residence when the Officers shined lights in the windows. Thus, it was reasonable for the Officers to interpret Cassady's unresponsiveness as signifying that Cassady was physically unable to respond, either because he was unconscious or dead. The Officers reasonably believed that knocking and announcing their presence was unnecessary in the situation they confronted.

¶46 It was equally reasonable for the Officers to interpret Cassady's unresponsiveness to mean that Cassady was "lying in wait" for them. The Officers knew that Cassady was very angry, had sustained head injuries, and that he had been drinking alcohol. Dispatch

17

had also informed them that Cassady had once shot at people on his property. Coupled with his perceived unresponsiveness at the Officers' attempts to contact him, we deem the Officers' determination that Cassady was on the offensive that evening as reasonable. The Officers held the reasonable belief that entering the home in stealth mode would increase officer safety in the circumstances presented, thereby serving as an exigent exception to the knock and announce requirement.

¶47 Finally, RJ's indirect consent could have led a reasonable officer to mistakenly believe that they did not need to comply with the knock and announce rule. The fact that the Officers held a key to the front door could have led them to conclude that they had received not only the authority to enter, but also the authority to do so unannounced. The better practice would have been for the Officers to have obtained consent from an authorized person on the premises that the Officers want to search, or at least directly from RJ. Nevertheless, we cannot attribute fault to the Officers for Conover's failure to inform them that RJ premised his consent, given through Conover, on the condition that the Officers identify themselves before entry. *See also* discussion at ¶ 39, above.

¶48 We are mindful of our duty to analyze the second prong of the *Saucier* test by examining the specific context of the situation confronting the Officers in Broadview that evening, and not as a mere theoretical exercise. *See Saucier*, 533 U.S. at 201-02, 121 S.Ct. at 2156. The Supreme Court recently reiterated this point in *Brosseau v. Haugen* (2004), 543 U.S. 194, 199, 125 S.Ct. 596, 599, 160 L.Ed.2d 583, when it deemed it error for the Ninth Circuit to apply the general tests for excessive use of force from *Tennessee v. Garner* (1985), 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1, and *Graham v. Connor*

18

(1989), 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443, to conclude that an officer was not entitled to qualified immunity from a plaintiff's § 1983 claim. Instead, the Court remanded to consider whether the law was clearly established in a more "'particularized sense'" to answer the question of qualified immunity. *Brosseau*, 543 U.S. at 199, 125 S.Ct. at 599. *See also United States v. Banks* (2003), 540 U.S. 31, 41-42, 124 S.Ct. 521, 528, 157 L.Ed.2d 343 (criticizing the Ninth Circuit for distorting the totality of the circumstances principle and replacing it with a "four-part scheme" for analyzing whether exigent circumstances presented an exception to the knock and announce rule).

¶49 In light of this direction, we conclude that it was reasonable for the Officers to believe that their conduct was lawful in the particular circumstances that they confronted in Broadview that evening. *Brosseau*, 543 U.S. at 199, 125 S.Ct. at 599. These circumstances included Cassady's perceived unresponsiveness, and the apparent, but nonetheless insufficient, consent that the Officers had received from one of the home's residents. See ¶ 39, above. The Officers are consequently entitled to qualified immunity from Cassady's § 1983 claim. *Saucier*, 533 U.S. at 202, 121 S.Ct. at 2156.

ISSUE TWO

¶50 Did the District Court commit error when it determined that the Officers did not use excessive force and, consequently, were entitled to qualified immunity from Cassady's § 1983 claim?

¶51 Cassady premised a portion of his § 1983 claim on allegations that the Officers used excessive force against him when Wallis shot Cassady. Cassady argues on appeal that the Officers' alleged unlawful entry cannot be divorced from the excessive force

claim. Cassady asserts that the Officers' failure to knock and announce transformed the Officers' subsequent force into an automatic violation of his constitutional rights.

¶52 Cassady fails to cite any authority, however, in support of this argument. Further, the Supreme Court has demonstrated a recent tendency to analyze the method of entry separate from subsequent events. For example, in *Hudson*, __ U.S. __, 126 S.Ct. at 2159, the Court concluded that the exclusionary rule did not apply to evidence obtained from officers' illegal entry into defendant's home when the officers violated the knock and announce rule. The Court's analysis included the reasoning, *inter alia*, that "*manner* of entry was *not* a but-for cause of obtaining the evidence." *Hudson*, ___U.S. at ___, 126 S.Ct. at 2164. We reject Cassady's contention that the method of entry somehow affects the manner in which we analyze the Officers' actions after entry. We turn then to the Officers' actions.

¶53 The Fourth Amendment permits a police officer to use only such force as is objectively reasonable under the circumstances. *Graham*, 490 U.S. at 395, 109 S.Ct. at 1871. An officer's use of deadly force is reasonable if the officer has probable cause to believe that the suspect posed a significant threat of death or serious physical injury to the officer or others. *Garner*, 471 U.S. at 11-12, 105 S.Ct. 1694 at 1701; *see also* § 45-3-102, MCA (providing that a person "is justified in the use of force likely to cause death or serious bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or serious bodily harm to himself or another . . ."). Courts should determine the reasonableness of a particular use of force from a reasonable officer on the

scene's perspective, and not with the 20/20 vision of hindsight. *Anyan*, ¶ 47 (citing *Banks*, 540 U.S. at 39, 124 S.Ct. at 527).

¶54 Wallis observed a laser sight on Schieno's face immediately upon the Officers' entry into the home. Wallis knew that the laser likely originated from a gun aimed at his partner. The Officers identified themselves as law enforcement and ordered Cassady repeatedly to drop his weapon. Cassady nonetheless maintained the laser on Schieno. Wallis then shot at Cassady. Wallis had probable cause to believe that Cassady posed a significant threat of injuring Schieno, and Wallis shot at Cassady to prevent serious bodily harm to his partner. *Garner*, 471 U.S. at 11, 105 S.Ct. at 1701; § 45-3-102, MCA. We conclude that the Officers did not use excessive force against Cassady and, consequently, did not violate Cassady's constitutional rights. Cassady has failed to establish the first prong of the *Saucier* test in that the Officers did not violate his constitutional rights. Thus, the District Court did not err when it granted the Officers qualified immunity for Cassady's § 1983 claim premised on the Officers' alleged use of excessive force. *See Saucier*, 533 U.S. at 200-01, 121 S.Ct. at 2155-56.

¶55 Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART

21

Justice Jim Rice concurring.

¶56 I disagree with the Court's assessment of the circumstances leading to the covert entry. The circumstances presented a sufficient threat to the officers' safety to justify their determination to make a no-knock entry. In *Anyan*, we said the following about whether safety concerns amount to "exigent circumstances":

> "[T]he presence of a weapon creates an exigent circumstance, provided the government is able to prove they possessed information that the suspect was armed and likely to use a weapon or become violent. Evidence that firearms are within a residence, by itself, is not sufficient to create an exigency to officers when executing a warrant. However, threats to an officer's safety, a criminal record reflecting violent tendencies, or a verified reputation of a suspect's violent nature can be enough to provide law enforcement officers with justification to forego the necessity of knocking and announcing their presence."
>
> *Bates*, 84 F.3d at 795 (internal citations omitted). "A concern for police safety must be based upon prior knowledge or direct observation that the subject of the search keeps weapons and that such person has a known propensity to use them."

*Anyan*, ¶ 44. In *State v. Ochadleus*, 2005 MT 88, 326 Mont. 441, 110 P.3d 448, we instructed that officers may make a no-knock entry when they had a "reasonable suspicion of exigency." *Ochadleus*, ¶ 56.

¶57 Here, it was known that Cassady had a weapon, had a "history of gunplay," had fired at others before, had earlier been in a violent fight with his son, had taken blows to the head that evening, and may have been intoxicated. One can quibble with whether the decision to proceed covertly was the *best* exercise of judgment, but given these

22

conditions, it was certainly *reasonable* "to believe that entry . . . was necessary to prevent physical harm to the officers . . . ." *Anyan*, ¶ 34.

¶58 Thus, the officers' judgment to proceed covertly was justified by circumstances giving rise to a reasonable suspicion of exigency that threatened their safety. Therefore, I concur in the Court's decision but disagree with its rationale, and I would not reach the second prong of the qualified immunity inquiry. On Issue Two, I agree with the Court's analysis of the excessive force claim.

/S/ JIM RICE

Justice James C. Nelson specially concurs.

¶59 I concur in the result we reach today, but not in all of the Court's reasoning.

¶60 First, with respect to Cassady's knock-and-announce claim, I agree with the Court that the Officers' failure to knock and announce their presence prior to entering Cassady's home violated his constitutional right to be free from unreasonable searches and seizures. As we explained in *State v. Anyan*, 2004 MT 395, 325 Mont. 245, 104 P.3d 511,

> a mere suspicion that weapons would be at a residence does not provide an exigency for the officers' failure to properly knock and announce their presence. "Our cases have made it clear that generalized fears about how drug dealers usually act or the weapons that they usually keep is not enough to establish exigency." *United States v. Granville* (9th Cir. 2000), 222 F.3d 1214, 1219. Evidence that firearms are within the residence or that a particular defendant is armed is not by itself sufficient to create an

23

exigency. [*United States v. Becker* (9th Cir. 1994), 23 F.3d 1537, 1541]; *United States v. Marts* (8th Cir. 1993), 986 F.2d 1216, 1218. There must be specific information to lead the officers to a reasonable conclusion that the presence of firearms raises concerns for the officers' safety. [*United States v. Moore* (10th Cir. 1996), 91 F.3d 96, 98].

*Anyan*, ¶ 44. Here, as the Court observes, any possibility of Cassady's demonstrating violence against the Officers did not rise to the level of relieving them of their constitutional duty to knock and announce their presence. ¶ 36.

¶61    I further agree with the Court that the Officers are entitled to qualified immunity on the knock-and-announce violation, though it is not clear from the Court's Opinion on what authority the Court is relying for our conclusion that the Officers' mistakes as to the legality of their actions were objectively "reasonable." *See Saucier v. Katz* (2001), 533 U.S. 194, 205, 121 S.Ct. 2151, 2158 ("If the officer's mistake as to what the law requires is *reasonable* . . . , the officer is entitled to the immunity defense." (emphasis added)). I also question whether it was "reasonable" for the Officers to forego knocking and announcing their presence based on the belief that doing so was "unnecessary," ¶ 45, given that the exceptions to the knock-and-announce requirement are based on exigencies, not lack of necessity, ¶ 31.

¶62    Lastly, with respect to Cassady's excessive force claim, I agree with the Court that the Officers' use of force following their entry into Cassady's home was not excessive and, therefore, did not constitute a constitutional violation. As the Court states, Sergeant Wallis observed a laser sight on Lieutenant Schieno's face immediately upon their entry into Cassady's home; Wallis knew that the laser likely originated from a gun aimed at Schieno; the Officers identified themselves as law enforcement and repeatedly ordered

24

Cassady to drop his weapon; and Cassady did not comply. Given these circumstances, Wallis had probable cause to believe that Cassady posed a significant threat of death or serious physical harm to the officers—Schieno in particular. *Cf. Tennessee v. Garner* (1985), 471 U.S. 1, 11-12, 105 S.Ct. 1694, 1701 ("[I]f the suspect threatens the officer with a weapon . . . , deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."). Accordingly, Wallis's shooting at Cassady was objectively reasonable under the circumstances.

¶63 With these caveats, I concur in the decision of the Court.


/S/ JAMES C. NELSON