No. 01-509

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 105

STATE OF MONTANA,

        Plaintiff and Respondent,

    v.

SHIRLEY SAXTON,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Nineteenth Judicial District,
In and for the County of Lincoln, Cause No. DC-00-9,
The Honorable Michael C. Prezeau, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            Ann C. German, Attorney at Law, Libby, Montana

        For Respondent:

            Hon. Mike McGrath, Attorney General; Mark Fowler,
            Assistant Attorney General, Helena, Montana

            Bernard Cassidy, Lincoln County Attorney; Robert Slomski, Deputy County
            Attorney, Libby, Montana

Submitted on Briefs:  December 13, 2002

Decided:  April 24, 2003

Filed:

_____
Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

¶1     The State charged the Defendant, Shirley Saxton, in the District Court for the Nineteenth Judicial District in Lincoln County with criminal production of dangerous drugs, criminal possession of dangerous drugs, and possession of drug paraphernalia. Saxton filed motions to suppress evidence recovered during a warrantless search of her home and statements made by her to a police officer. The District Court denied those motions. Saxton pled guilty to one count of criminal production of dangerous drugs. She appeals the District Court's orders denying her motions to suppress evidence. We affirm the judgment of the District Court.

¶2     The issues on appeal are:

¶3     1. Did the District Court err when it denied Saxton's motion to suppress evidence obtained through a warrantless search of her home?

¶4     2. Did the District Court err when it denied Saxton's motion to suppress evidence based on the State's failure to preserve or promptly provide audio recordings from her 911 call to the police and a police officer's "belt recording"?

¶5     3. Did the District Court err when it denied Saxton's motion to exclude evidence of her conversations with a police officer?

FACTUAL AND PROCEDURAL BACKGROUND

¶6     On March 14, 2000, Shirley Saxton was at her home in Rexford, Montana, with her boyfriend Ted Wilson, when Saxton's adult son, Tommy Arms, entered her home. Arms, who was intoxicated and belligerent, yelled at Saxton and at some point hit her in the

2

stomach with a coffee cup, causing her to lose consciousness. Arms then fought with Wilson. While they fought, Saxton regained consciousness, fled her mobile home, and went next door to her daughter's (Teresa Cantu's) mobile home and called 911.

¶7     Saxton told the 911 dispatcher, Judy Romeo, that her son was "drunk and violent, and he was hurting people and throwing things" in her trailer. She told Romeo that she was at her daughter's house and was not going to return home, but that she feared that Arms would find her at Cantu's home and try to hurt her so she needed to leave. Romeo asked Saxton for the address, but Saxton could not recall the address. Saxton told Romeo that she had to go and hung up.

¶8     Romeo contacted Matt Neuman, a sheriff for Lincoln County who was off-duty at the time, and requested that he respond to the call. She described the circumstances as an "urgent domestic situation." Neuman agreed to respond and picked up James Handy, a Eureka city police officer, to assist in the response. Meanwhile, Romeo called Cantu's number to obtain better directions to Cantu's house, and spoke with Cantu, who gave additional directions that were forwarded to Neuman.

¶9     After calling 911, Saxton left Cantu's trailer and hid behind her trailer. Cheryl Gillard, Saxton's neighbor, found Saxton in her backyard and took Saxton back into her house to get Wilson. The three then went to the Frontier Bar, which was about 75 feet from Saxton's trailer. As Saxton went to the Frontier Bar, she heard a crashing noise at her trailer and heard Arms yell "I'm going to kill you." Saxton hid in the Frontier Bar's bathroom until police arrived at her trailer.

3

¶10    Neuman and Handy traveled with their emergency lights activated from Eureka to the Rexford trailer park. Neuman parked in Cantu's driveway and approached Cantu's home where he met a young male who directed Neuman to Saxton's nearby home. Neuman knocked on Saxton's door, and yelled "hello" several times. There was no answer. Neuman knocked on the door again, and a part of the window, which was recently broken, fell to the ground. Neuman then opened Saxton's door and entered the home. Neuman and Handy performed an armed "quick sweep through the house," going door-to-door through the trailer to see if anyone was inside. Inside one of the doors, Neuman immediately recognized a "marijuana grow," including a low-hanging fluorescent light fixture and several potted plants. Neuman and Handy continued through the remainder of the house and then exited Saxton's house.

¶11    Outside the house, the officers met Gillard, who had left the Frontier Bar to talk to the officers, and asked her to bring Saxton back to her trailer. Gillard left and returned with Saxton a few minutes later.

¶12    Neuman spoke with Saxton regarding the assault. Saxton described the assault and her injuries, after which Neuman asked Saxton if she would like to leave to get medical attention for her injuries. Saxton declined, stating that she could not afford an ambulance. Neuman asked Saxton if she would be willing to have a friend take her to the hospital, but Saxton also declined that offer.

¶13    At some point in their conversation, Neuman asked Saxton who owned the marijuana plants inside her trailer. Saxton initially told Neuman that the marijuana was Arms'.

4

However, a short time later Saxton admitted that the marijuana was hers and stated that she was growing it for medicinal and research purposes. Neuman asked Saxton if she had a permit to grow the marijuana and she said she did not. After his discussion with Saxton, Neuman obtained a search warrant for Saxton's home, and the police seized evidence from the "marijuana grow."

¶14 About 10 days after the seizure of evidence, Saxton called Neuman to discuss the pending case against her, and Saxton made additional incriminating statements regarding her ownership of the seized plants.

¶15 On March 31, 2000, the State charged Saxton with criminal production of dangerous drugs, criminal possession of dangerous drugs, and criminal possession of drug paraphernalia. On May 30, 2000, Saxton moved to suppress evidence obtained from Neuman's warrantless search of her home, contending that Neuman should have obtained a search warrant prior to entering her home. The District Court held an evidentiary hearing to consider Saxton's motion to suppress on October 5, 2000, where Neuman disclosed for the first time that he had a "belt recording" of his response to Saxton's house. Neuman testified that he had previously listened to the tape, and discovered that the recording was mostly unintelligible, and had set the tape aside and had forgotten about it until he was summoned to appear at the suppression hearing. The parties also established, at the hearing, that the 911 dispatch center did not record Saxton's phone call to 911.

¶16 As a result of the hearing, Saxton filed another motion to suppress on the grounds that the State failed to preserve and provide exculpatory evidence. The District Court later

5

denied both of these motions, and ordered that a copy of Neuman's "belt recording" be produced for additional audio enhancement to determine whether there was additional useful evidence for Saxton's defense. After obtaining the enhanced "belt recording," Saxton filed a motion to suppress her statements to Neuman. The District Court eventually denied all of Saxton's motions to suppress evidence.

¶17 Saxton entered into a plea agreement with the State and agreed to plead guilty to one count of criminal production of dangerous drugs. The agreement provided that Saxton could appeal the District Court's rulings on her motions to suppress evidence. Saxton pled guilty to the one count and the District Court sentenced her to a three-year suspended sentence.


STANDARD OF REVIEW

¶18 We review a district court's denial of a motion to suppress evidence to determine whether the court's findings of fact are clearly erroneous. *State v. Bassett*, 1999 MT 109, ¶ 17, 294 Mont. 327, ¶ 17, 982 P.2d 410, ¶ 17; *State v. Kaufman*, 2002 MT 294, ¶ 12, 313 Mont. 1, ¶ 12, 59 P.3d 1166, ¶ 12. Findings of fact are clearly erroneous where they are not supported by substantial evidence, where the court misapprehends the effect of the evidence, or where this Court's consideration of the record results in a firm conviction that a mistake has been made. *State v. Jarman,* 1998 MT 277, ¶ 8, 291 Mont. 391, ¶ 8, 967 P.2d 1099, ¶ 8.

¶19 Whether the factual circumstances determined by the District Court constitute "exigent circumstances" is a conclusion of law that we will review for correctness. *Bassett*, ¶ 17; *State v. McBride,* 1999 MT 127, ¶ 11, 294 Mont. 461, ¶ 11, 982 P.2d 453, ¶ 11.

6

¶20 We review a district court's orders regarding evidentiary matters and motions to exclude evidence for alleged discovery violations for an abuse of discretion. *State v. Duffy*, 2000 MT 186, ¶ 18, 300 Mont. 381, ¶ 18, 6 P.3d 453, ¶ 18.

DISCUSSION

ISSUE 1

¶21 Did the District Court err when it denied Saxton's motion to suppress evidence obtained through a warrantless search of her home?

¶22 In its order denying Saxton's motion to suppress evidence obtained as a result of Neuman's warrantless search of her home, the District Court concluded that exigent circumstances existed to justify Neuman's entry. It found that Neuman was responding to a "frantic call from Saxton that her son 'was drunk and throwing [things] around and hitting people,'" and that Neuman was dispatched to investigate the alleged assault and protect potential victims from further assault. The District Court concluded that it was reasonable, when Neuman had not located Arms or Saxton, and heard no answer from inside Saxton's trailer after knocks and calls from outside Saxton's door, to enter Saxton's trailer to protect the lives of possible victims inside. The District Court also relied upon § 46-6-311(2), MCA, which provides that domestic violence calls constitute an exigent circumstance for making an arrest.

¶23 Saxton contends that the District Court erred when it concluded that there were exigent circumstances because Saxton's testimony showed that she had told Romeo, the 911 dispatcher, that she was not at her trailer when she called and that she would not be returning

7

to her trailer. Saxton contends that if Neuman was aware of that statement, and heard no evidence of domestic violence after arriving at her home, there were no exigent circumstances which justified his warrantless entry into her home.

¶24 The State points out that Saxton's own testimony at the suppression hearing was that she had told Romeo that Arms was hitting other people, *i.e.,* other victims, and that Neuman's entry into Saxton's home was necessary for the possible discovery and protection of unconscious or helpless victims.

¶25 We have recognized that the United States and Montana Constitutions protect persons from unreasonable searches and seizures. *State v. Wakeford*, 1998 MT 16, ¶ 21, 287 Mont. 220, ¶ 21, 953 P.2d 1065, ¶ 21 (citing U.S. CONST. amend. IV; Art. II, Sec. 11, MONT. CONST.). We have also recognized the rule that warrantless searches conducted inside a person's home are *per se* unreasonable, with few exceptions to that rule. *Wakeford*, ¶ 21.

¶26 There is an exception to the warrant requirement where an officer concludes that there are "exigent circumstances" and "probable cause" to justify a warrantless search. *Wakeford*, ¶ 22. We have previously adopted the Ninth Circuit Court of Appeals' definition of "exigent circumstances," which is:

> [T]hose circumstances that would cause a reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.

*Wakeford*, ¶ 24 (quoting *United States v. McConney* (9th Cir. 1984), 728 F.2d 1195, 1199). We have also previously stated that "probable cause exists 'if the facts and circumstances

8

within the officer's personal knowledge, or imparted to the officer by a reliable source, are sufficient to warrant a reasonable person to believe that the suspect has committed an offense.'" *Wakeford*, ¶ 22 (quoting *State v. Schoffner* (1991), 248 Mont. 260, 264, 811 P.2d 548, 551).

¶27    Based on the facts in this case, we agree that there were exigent circumstances and probable cause that justified Neuman's warrantless entry into Saxton's trailer. The testimony clearly established that Saxton had reported that Arms had assaulted her and others in Saxton's trailer. Although Saxton had called 911 from Cantu's trailer, and had apparently told Romeo that she would not be at her home, when Neuman responded, he could not locate Saxton or Arms, and was directed to Saxton's trailer, the place where the reported assault(s) occurred. It was reasonable for Neuman to conclude, when knocking on Saxton's trailer door and hearing no response, that it was necessary to enter her home to discover and protect Saxton or other potentially incapacitated victims.

¶28    We conclude that the District Court did not err when it denied Saxton's motion to suppress evidence obtained as a result of Neuman's warrantless entry into her trailer.

ISSUE 2

¶29    Did the District Court err when it denied Saxton's motion to suppress evidence based on the State's failure to preserve or promptly provide audio recordings from her 911 call to the police and a police officer's "belt recording"?

¶30    The District Court decided that it would not suppress or exclude evidence on account of the State's failure to record Saxton's 911 call or Neuman's failure to disclose that he had

a "belt recording" until the suppression hearing. The District Court found that there was no evidence to suggest that the failure to record Saxton's 911 phone call was deliberate, or that Neuman's failure to produce the "belt recording" was a deliberate attempt to frustrate Saxton's defense because the tape itself was unintelligible, as Neuman had testified. The District Court permitted Saxton the opportunity to review and enhance Neuman's "belt recording," but the enhanced recording provided little additional evidence helpful to Saxton's defense. Lastly, the District Court concluded that there would be little evidentiary value provided by the 911 phone call recording.

¶31   Saxton contends that the District Court abused its discretion when it refused to suppress evidence on the grounds that the State failed to preserve evidence helpful to her defense and Neuman's late disclosure that he had a "belt recording" of his response to Saxton's trailer.

¶32   We have previously held that a defendant has a constitutional right to obtain exculpatory evidence, and that the State must not interfere with that right. *State v. Sadowski* (1991), 247 Mont. 63, 79, 805 P.2d 537, 546. However, we have also stated that "police officers are not required to take initiative or even assist the defendant with procuring [exculpatory] evidence." *State v. Belgarde*, 1998 MT 152, ¶ 16, 289 Mont. 287, ¶ 16, 962 P.2d 571, ¶ 16. Police officers have no affirmative duty to collect exculpatory evidence, but they "may not frustrate or hamper an accused's right to obtain exculpatory evidence." *Belgarde*, ¶ 16 (citing *State, City of Bozeman v. Heth* (1988), 230 Mont. 268, 272, 750 P.2d 103, 105). We declared in *Heth* that:

> Only a deliberate or intentional suppression of exculpatory evidence is a per se violation of due process. To amount to a denial of due process, negligently suppressed evidence must be vital to the defense. It must be more than a mere suppression, in that the defense must show the evidence was material and of substantial use. Finally, the evidence must be exculpatory meaning it "[w]ould have tended to clear the accused of guilt, to vitiate a conviction."

*State v. Heth* (1988), 230 Mont. 268, 272, 750 P.2d 103, 105 (quoting *State v. Patterson* (1983), 203 Mont. 509, 512-13, 662 P.2d 291, 293). To establish materiality, the evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta* (1984), 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (quoted in *State v. Halter* (1989), 238 Mont. 408, 412, 777 P.2d 1313, 1316).

¶33 We agree with the District Court's conclusion that nothing suggests that the State deliberately or intentionally failed to record Saxton's 911 phone call or that Neuman deliberately withheld his "belt recording." In addition, there is no evidence to suggest that a recording of Saxton's 911 phone call or Neuman's "belt recording" were "vital" evidence for Saxton's defense. We have previously concluded that Neuman's belief that other potential victims could be in Saxton's trailer was sufficient to justify his entry into her trailer and Saxton confirmed that she made that report during her 911 call to the police. In addition, Neuman's "belt recording," which Saxton had the opportunity to enhance and examine, has provided no additional evidence to dispel a finding that there were exigent circumstances and probable cause to justify Neuman's warrantless entry into her home.

11

¶34    Since none of the evidence was material to Saxton's defense and there was no deliberate suppression of evidence, we conclude the District Court did not abuse its discretion when it denied Saxton's second motion to suppress evidence.

ISSUE 3

¶35    Did the District Court err when it denied Saxton's motion to exclude evidence of her conversations with a police officer?

¶36    The District Court concluded that it would not suppress Saxton's statements to Neuman because it found that Saxton's statements were given voluntarily and without any coercion by Neuman.

¶37    Saxton's lone contention on appeal is that her statements to Neuman were not voluntary because Neuman had restricted her freedom by not permitting her to enter her home without him, and that her conversation with Neuman was therefore a "custodial interrogation" such that Neuman should have given her the warnings required by *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The State contends that Neuman repeatedly told Saxton that she was free to leave with a friend to seek medical treatment, that she was never placed under arrest or any other physical restraint, and that the statements Saxton made were volunteered during the course of his investigation of her 911 call.

¶38    We have held that the State may not used confessions or admissions obtained through "custodial interrogation" without proper *Miranda* warnings being given. *State v. Rushton* (1994), 264 Mont. 248, 255, 870 P.2d 1355, 1359. The United States Supreme Court has

12

defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. When we determine whether a defendant was subject to a "custodial interrogation," we will decide, considering the totality of the circumstances, whether "a 'reasonable person' would not feel free to leave, after considering such factors as the time and place of interrogation, the length and mood of interrogation, and persons present during the questioning." *Rushton*, 264 Mont. at 256, 870 P.2d at 1360 (citations omitted); *see State v. Scarborough*, 2000 MT 301, ¶ 31, 302 Mont. 350, ¶ 31, 14 P.3d 1202, ¶ 31.

¶39    We conclude that, after reviewing the totality of the circumstances, Neuman's conversation with Saxton was not a "custodial interrogation." The evidence demonstrates that Neuman was talking to Saxton as a result of her 911 call and report that Arms had assaulted her. Neuman had told Saxton that she was free to leave to seek medical attention for her injuries. Neuman did not physically restrain Saxton in any way. Finally, Saxton volunteered that she owned the marijuana and grew it for medicinal purposes without any direct questioning from Neuman, following her earlier denial that she owned the marijuana when Neuman specifically asked her who the marijuana belonged to. This evidence supports the conclusion that a reasonable person would have felt free to leave during Neuman's questioning and that it was not a "custodial interrogation" within the contemplation of *Miranda*.

¶40    Similarly, Saxton's telephonic statements to Neuman 10 days after Neuman's dispatch to her trailer are also admissible.  In this instance, Saxton initiated the contact with Neuman by calling him to discuss Neuman's investigation of the matter, and her statements were clearly not obtained as a result of any physical restraint or "custodial interrogation."

¶41    Accordingly, we conclude that the District Court did not err when it denied Saxton's motion to suppress statements she made to Neuman.

¶42    For the foregoing reasons, the judgment of the District Court is affirmed.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ JIM REGNIER
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER

14