No. 05-651

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 111

THE STATE OF MONTANA,

          Plaintiff and Respondent,

   v.

ROBERT MICHAEL GOMEZ,

          Defendant and Appellant.

APPEAL FROM:    The District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DC 2004-195(A),
Honorable Ted O. Lympus, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Dean Knapton, Attorney at Law, Kalispell, Montana

      For Respondent:

          Honorable Mike McGrath, Attorney General; Tammy K. Plubell,
Assistant Attorney General, Helena, Montana

          Ed Corrigan, County Attorney, Kalispell, Montana

Submitted on Briefs:  October 4, 2006

Decided:  May 8, 2007

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Appellant Robert Michael Gomez (Gomez) appeals his conviction in the District Court for the Eleventh Judicial District, Flathead County, of operating an unlawful clandestine laboratory, a felony. We affirm.

¶2 Gomez raises the following issues on appeal:

¶3 (1) Did the District Court err in denying Gomez's motion to suppress evidence based on a warrantless search of:

    a. the motor home, with the landlord's consent?

    b. the padlocked duffel bag, pursuant to exigent circumstances?

¶4 (2) Did the District Court err in denying Gomez's motion *in limine* made pursuant to M. R. Evid. 404(b) regarding other crimes, wrongs, or bad acts?

¶5 (3) Did the District Court abuse its discretion by denying Gomez's objection to a State's witness testifying on redirect examination by reading portions of her prior statement?

¶6 (4) Did the District Court abuse its discretion by overruling Gomez's objection to the introduction of evidence on chain of custody grounds?

¶7 For the reasons discussed herein, we decline to address issues (2) through (4).

## BACKGROUND

¶8 Noemi and Revard Lund (Lunds), of Kalispell, Montana, met Gomez at a local homeless shelter and hired him to do some work for them. Shortly after beginning work for the Lunds, Gomez told them that he could no longer stay at the shelter. The Lunds allowed Gomez to stay in their motor home, which they used primarily for storage, while

he worked for them. Since the motor home did not have cooking facilities or running water, Gomez ate his meals and used the bathroom in the Lunds' home.

¶9 Rebecca Keys (Rebecca) lives in Whitefish, Montana. Rebecca also met Gomez at the homeless shelter, and they quickly formed an intimate relationship. After spending the night of May 12, 2004, with Gomez at the motor home, Rebecca left town for a long weekend. At that time, Rebecca's sister, Angela, was visiting Rebecca. Because Angela did not have a driver's license, Rebecca left her car keys with Gomez and encouraged him to entertain Angela during her absence, which he did. Gomez took Angela out on several occasions over the next several days, and, according to Angela's testimony, on one particular trip they went to a feed store where Gomez bought a big bottle of what looked like iodine, went to another store where he purchased a stack of paper matches, and then dropped off his purchases at the motor home. Gomez told Angela not to come into the motor home.

¶10 By May 16, 2004, Angela's son had come to stay with Angela at Rebecca's apartment. Gomez continued to frequent Rebecca's apartment, and, because Rebecca's apartment key was on the same keychain as her car key, Gomez would let himself into the apartment. This was initially fine with Angela, but when Angela's son came to visit, she became perturbed, feeling Gomez was out-staying his welcome. Upon discovering indications that Gomez had stolen some of Rebecca's money, Angela called the police. Officer Childers and Officer Peters of the Whitefish Police Department responded to Rebecca's apartment, and with Angela's permission they entered the apartment. The

3

officers found Gomez hiding in the attic, whereupon they arrested him for trespass and removed him from the apartment.

¶11 Rebecca returned later that same day and gave the officers permission to search her car, which Gomez had been using. In the trunk, the officers discovered items commonly used in the manufacturing of methamphetamine. Consequently, the matter was referred to the Northwest Drug Task Force. Scott Meehan (Meehan), a detective for the task force, found lighter fluid, a duffle bag containing multi-layered liquids in bottles, an anti-freeze jug containing a suspicious liquid, a latex medical glove duct-taped to the end of a Coke bottle, a bottle of rubbing alcohol, Red Devil Lye, test strips for pools and spas, and a So-Be bottle. The drug agents then followed drug lab seizure procedures to secure and identify the items.

¶12 Meanwhile, when Gomez failed to appear for a few days, Noemi Lund (Noemi) went to the motor home to see if Gomez's belongings were still there and noticed that Gomez was utilizing a two-burner electric stove, which she assumed was for food preparation. When a couple more days passed without hearing from Gomez, the Lunds padlocked the motor home so Gomez would have to request access from them in order to obtain his belongings.

¶13 From his investigation, Meehan became concerned about whether Gomez may have been manufacturing methamphetamine in the Lunds' motor home. On May 19, 2004, Meehan met with the Lunds and received their permission to search the motor home. The Lunds removed the padlock. Upon entering the motor home, Meehan saw various items which appeared to have recently been used to manufacture

4

methamphetamine. He immediately backed out of the motor home and called for a drug lab team.

¶14 Due to the potential danger that can arise at a methamphetamine laboratory and their belief that methamphetamine had recently been manufactured inside the motor home, the officers donned "hazmat" protective suits with respirators. The officers also exercised extraordinary caution in removing the lab materials in individual pieces, meticulously identifying each piece, including an electric cooktop stove with a white powdery substance spilled and crusted over the burners, jugs and jars containing unknown liquids, propane canisters, coffee filters, rubber gloves, and a quart of lighter fluid. Bedding in the motor home was lying adjacent to the lab materials. Observing that the bedding was very porous and believing that it was contaminated due to its proximity to the chemicals, the officers decided to remove the bedding to destroy it. An officer then picked up a padlocked black duffle bag that was sitting on or with the bedding, and in doing so, the officers heard the sounds of clanging metal or glass and sloshing liquid within the bag. They became extremely concerned about the potential presence of dangerous chemicals and immediately removed the bag from the motor home and placed it on a tarp on the ground. Without obtaining a search warrant and within about one minute after discovering it, the officers cut the lock and opened the bag, finding a jar of gray crystals that Meehan believed to be iodine crystals, a jar with a red substance labeled muriatic acid, pool and spa tester strips, a multi-layered liquid, and an unknown liquid.

¶15 Gomez was ultimately charged by an amended information with one count of operation of an unlawful clandestine laboratory and one count of criminal possession of

5

dangerous drugs. The possession charge was later dismissed on the State's motion. Gomez filed a motion to suppress the items seized from the motor home on the grounds the search violated the United States and Montana Constitutions. A hearing scheduled on the motion was vacated when the parties reached a plea agreement and Gomez entered a guilty plea to the charge. However, Gomez later sought to withdraw his plea, which was granted by the District Court. A hearing on Gomez's suppression motion and his motion to exclude evidence of other crimes and wrongs was then scheduled for April 8, and a jury trial was scheduled for April 18, 2005.

¶16 At the hearing, Gomez advised the court that he was withdrawing his suppression argument, based upon the Lunds not having authority to consent to the search of the motor home's bedroom, and would instead argue only that the warrantless search of the padlocked duffle bag was unconstitutional. After hearing, the District Court, noting the impending trial, issued a written order denying Gomez's motions and indicated that a fuller rationale would follow, but which apparently was never provided. A jury trial was conducted on April 18 through April 20, 2005, during which Gomez filed two objections. The first was to a witness reading a portion of her prior statement, which the court overruled because defense counsel had previously cross-examined the witness from the same statement, and, secondly, that the State had not established a sufficient chain of custody foundation for several exhibits, which was also overruled. Gomez was found guilty of operating an unlawful clandestine laboratory and was thereafter sentenced to thirty years in the Montana State Prison with fifteen years suspended. He appeals.

6

## STANDARD OF REVIEW

¶17 This Court reviews a district court's denial of a motion to suppress to determine whether the court's findings of fact are clearly erroneous and whether its interpretation and application of the law is correct. *State v. DeWitt,* 2004 MT 317, ¶ 21, 324 Mont. 39, ¶ 21, 101 P.3d 277, ¶ 21. A district court's findings of fact are clearly erroneous if: (1) they are not supported by substantial evidence; (2) the district court misapprehended the effect of the evidence; or (3) the district court made a mistake. *DeWitt,* ¶ 21.

¶18 We review a district court's evidentiary rulings for an abuse of discretion. *State v. McCaslin,* 2004 MT 212, ¶ 15, 322 Mont. 350, ¶ 15, 96 P.3d 722, ¶ 15. A district court abuses its discretion if it acts arbitrarily without conscientious judgment or exceeds the bounds of reason. *McCaslin,* ¶ 15.

## DISCUSSION

***¶19 (1) Did the District Court err in denying Gomez's motion to suppress evidence based on a warrantless search of:***

***a. the motor home, with the landlord's consent?***

¶20 Gomez contends that a landlord has no authority to grant permission for a search of a suspect's residence. Therefore, he argues that the Lunds did not have the authority to consent to the search of the motor home where he was staying. The State responds that this issue has not been preserved for appeal, because Gomez withdrew this argument at the suppression hearing and it was never ruled upon by the District Court.

¶21 The rule is well established that this Court will not address an issue raised for the first time on appeal. *State v. Peterson*, 2002 MT 65, ¶ 24, 309 Mont. 199, ¶ 24, 44 P.3d

499, ¶ 24 (citing *State v. Weaselboy*, 1999 MT 274, ¶ 16, 296 Mont. 503, ¶ 16, 989 P.2d 836, ¶ 16). Therefore, a party may not raise new arguments or change its legal theory on appeal. *Unified Industries, Inc. v. Easley*, 1998 MT 145, ¶ 15, 289 Mont. 255, ¶ 15, 961 P.2d 100, ¶ 15. "The reason for the rule is that it is fundamentally unfair to fault the trial court for failing to rule on an issue it was never given the opportunity to consider." *State v. Martinez*, 2003 MT 65, ¶ 17, 314 Mont. 434, ¶ 17, 67 P.3d 207, ¶ 17.

¶22 Gomez withdrew and did not make an argument in the District Court that the search of the motor home, pursuant to the Lunds' consent, was illegal. Therefore, we decline to address this issue.

### b. the padlocked duffel bag, pursuant to exigent circumstances?

¶23 "We have recognized that the United States and Montana Constitutions protect persons from unreasonable searches and seizures." *State v. Saxton*, 2003 MT 105, ¶ 25, 315 Mont. 315, ¶ 25, 68 P.3d 721, ¶ 25 (citing *State v. Wakeford*, 1998 MT 16, ¶ 21, 287 Mont. 220, ¶ 21, 953 P.2d 1065, ¶ 21). "We have also recognized the rule that warrantless searches conducted inside a person's home are *per se* unreasonable, with few exceptions to that rule." *Saxton*, ¶ 25. "There is an exception to the warrant requirement where an officer concludes that there are 'exigent circumstances' and 'probable cause' to justify a warrantless search." *Saxton*, ¶ 26 (quoting *Wakeford*, ¶ 22). Here, the parties dispute only the existence of exigent circumstances for the warrantless search of the duffle bag, which was located within the motor home.

¶24 This Court has defined exigent circumstances as those circumstances that "would cause a reasonable person to believe that entry (or other relevant prompt action) was

necessary to prevent physical harm to the officers or other person, the destruction of relevant evidence, the escape of a suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *Cassady v. Yellowstone County Sheriff*, 2006 MT 217, ¶ 33, 333 Mont. 371, ¶ 33, 143 P.3d 148, ¶ 33 (quoting *State v. Anyan*, 2004 MT 395, ¶ 34, 325 Mont. 245, ¶ 34, 104 P.3d 511, ¶ 34); *see also State v. Bassett*, 1999 MT 109, ¶ 47, 294 Mont. 327, ¶ 47, 982 P.2d 410, ¶ 47 ("In determining whether exigent circumstances exist, the court considers factors such as the possible destruction of evidence, the mobility of the evidence, the safety of police officers, the gravity of the crime, and other emergency situations.").

¶25 Gomez argues the State's attempt to validate the search on the basis of exigent circumstances—public and officer safety—are specious. Gomez contends the officers had no right to even pick up the bag, because if they had suspected it contained methamphetamine lab materials then, based on their experience and training, they should have known that disturbing the bag could unleash the fumes and explosive chemicals, which later formed this concern. Therefore, the officers should not have disturbed it without a warrant.

¶26 The State contends that the officers were properly engaged in detoxifying the property when the duffle bag was moved, and they were necessarily required to immediately determine if dangerous chemicals were present in order to minimize any potential danger and, thus, exigent circumstances were present. Alternatively, the State argues that Gomez has not challenged the officers' authority to seize all items indicative of a methamphetamine lab, which were in plain view.

¶27    In *U. S. v. Lloyd*, the Eighth Circuit Court of Appeals held "[t]he dangers created by methamphetamine labs can justify an immediate search because of exigent circumstances '[d]ue to the volatile nature of such labs.'" *U. S. v. Lloyd*, 396 F.3d 948, 954 (8th Cir. 2005), *cert. denied, Lloyd v. U. S.*, 545 U.S. 1110, 125 S. Ct. 2558 (2005) (quoting *Kleinholz v. U. S.*, 339 F.3d 674, 677 (8th Cir. 2003); *see also State v. Chapman*, 813 P.2d 557, 560-61 (Or. App. 1991) (concluding that a working methamphetamine lab provided exigent circumstances for warrantless search). We have stated that "[e]xigent circumstances for conducting a warrantless search exist 'where it is not practicable to secure a warrant.'" *Bassett*, ¶ 47 (quoting *State v. McCarthy*, 258 Mont. 51, 57, 852 P.2d 111, 114 (1993).

¶28    With the Lunds' consent, Meehan entered the motor home and, upon seeing the materials identified herein, immediately backed out. He did not see the duffle bag on the initial entry. He called for a drug lab team, which arrived in a lab truck within approximately fifteen minutes. After securing the perimeter of the scene to keep the public away from the motor home, Officers Meehan and Kevin McCarvel suited up in protective clothing[1] and entered the motor home, while other officers worked outside. The purpose of two officers entering the motor home was explained as "in case somebody gets hurt, gets overcome by chemicals, you need somebody that can pull somebody out." During the process of removing the potentially hazardous materials from

---

[1]According to Meehan's testimony, the protective clothing included a Tyvek suit with full respirator, Nomex gloves topped with rubber gloves and footwear consisting of rubber booties. All seams in the gear, including the hoods, were sealed with duct tape.

the motor home, they noticed a porous blanket or bedding that was lying adjacent to the materials, specifically, a garbage can containing coffee filters on which a red substance had been spilled. Confident that the bedding was contaminated, due to its proximity to the lab materials, the officers believed it should be removed and destroyed. While attempting to do so, one of the officers picked up the duffle bag sitting on or with the bedding and the officers heard the sounds of liquid sloshing and metal or glass clanging within the bag. The officers testified they originally did not have intentions of opening the bag, but that this changed when they heard these noises. Of concern to the officers was the possibility of a chemical reaction, particularly given the minimal ventilation in the small motor home's interior.[2] Meehan explained as follows:

> Due to the circumstances, like I said, we had disturbed a bag, hearing chemicals slosh around, I didn't know if - there is - you know, there is many different gasses that can be produced from these specific chemicals involved in methamphetamine. There can – you know, there is threat of fire and explosion with other trailers in close proximity, children around. We had – we actually had one person coming over to try to visit the Lunds. We had people present, we had unknown chemicals present – what we believed to be unknown chemicals, and we felt that the hazards – needed to get into the bag to separate the chemicals out.

The officers brought the bag out of the motor home, laid it on a tarp, and notified the safety officer, Detective Wingert, of the presence of suspect liquids in the bag. Meehan testified that he believed applying for a search warrant would have taken at least forty-

---

[2]Meehan estimated that the interior area of the motor home measured "probably six or seven feet wide by probably seven to eight feet deep" and added: "There wasn't a lot of room. We couldn't pass each other. I mean it was one in, one out. And the length of this motor home from the front door to the back, you know, couldn't have been more than probably ten feet, fifteen feet maximum."

five minutes. The bag was opened within about one minute after the officers heard the noises, no warrant having been obtained.

¶29 We conclude the District Court did not err in holding that exigent circumstances justified the officers' warrantless search of the duffle bag. An urgency had arisen during the process of dismantling the methamphetamine lab, which posed a potential threat to the safety of the officers, as well as the properties and persons in the immediate area.

¶30 *Issues 2, 3, and 4.*

¶31 Gomez's briefing with regard to these issues consists of only three paragraphs within approximately one page, and fails to cite a case in any of the arguments. Citing M. R. App. P. 23(a)(4), the State contends that Gomez's arguments are insufficiently supported with authority and that this Court should decline to consider the arguments. We agree.

¶32 The Montana Rules of Appellate Procedure govern the procedure for appeals to this Court in civil and criminal cases. The Rules are designed to ensure that parties to an appeal present their cases in a way that provides this Court with the necessary information to render an informed, legally correct ruling, and to facilitate fairness and judicial economy. In regard to a brief's substance, M. R. App. P. 23(a)(4) provides that the argument section "shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and pages of the record relied on."

¶33 Moreover, a district court's decision is presumed correct, *Matter of M.J.W.*, 1998 MT 142, ¶ 18, 289 Mont. 232, ¶ 18, 961 P.2d 105, ¶ 18 (citations omitted), and the

12

appellant bears the burden of establishing error. *M.J.W.*, ¶ 18; *see also, Small v. Good*, 284 Mont. 159, 163, 943 P.2d 1258, 1260 (1997); *Rieman v. Anderson*, 282 Mont. 139, 147, 935 P.2d 1122, 1127 (1997). Furthermore, "[i]t is not this Court's job to conduct legal research on his behalf, to guess as to his precise position, or to develop legal analysis that may lend support to that position." *Johansen v. State, Dept. of Natural Resources*, 1998 MT 51, ¶ 24, 288 Mont. 39, ¶ 24, 955 P.2d 653, ¶ 24 (citations omitted).

¶34 Gomez's arguments with regard to Issues 2, 3, and 4 have failed to meet the standards under M. R. App. P. 23(a)(4) and have failed to carry the appellant's burden to demonstrate error in the rulings of the District Court which are challenged within these issues.

¶35 Affirmed.

/S/ JIM RICE

We concur:

/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ JOHN WARNER

Chief Justice Karla Gray, specially concurring.

¶36    I join the Court's opinion and the results it reaches.  I write separately to state the obvious, which is that the District Court totally ignored its duty with regard to determinations on the motion to suppress.

¶37    As the Court properly states at ¶ 16, the District Court issued a written order denying the various motions and "indicated that a fuller rationale would follow[.]" The District Court did not file findings of fact and conclusions of law.

¶38    M. R. Civ. P. 52(a) requires that "[i]n all actions tried upon the facts without a jury . . . , the court shall find the facts specially and state separately its conclusions of law thereon[.]"  The District Court failed to satisfy this requirement.  Consequently, this Court cannot apply its clearly erroneous standard of review of trial court findings, as set forth in the Court's Opinion at ¶ 17.

¶39    I recognize fully that some district courts in Montana are overloaded with filings and have insufficient staff to assist them.  However, this reality does not, and cannot be allowed to, excuse trial courts from their obligations in the first instance, and foist their jobs off onto this Court—which also is overloaded with filings and insufficiently staffed.

¶40    We should not allow district courts to avoid meeting their obligations by doing their work for them, and I will not join in any future opinion which does so.  Rather than delay this already "whiskered" case—in which the notice of appeal was filed on August 5, 2005—any longer, I choose in this final instance to join the Court in addressing the suppression issue on its merits rather than remanding with instructions to the District Court to make, enter and file findings of facts and conclusions of law.

14

¶41     For these reasons, while concurring in the Court's opinion, I specially concur with regard to what is not stated therein.

/S/ KARLA M. GRAY