DA 07-0472

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 276

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

LINDSEY DENAE WHISLER,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 06-807
Honorable G. Todd Baugh, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

         Jim Wheelis, Chief Appellate Defender; Roberta R. Zenker, Assistant
Appellate Defender, Helena, Montana

     For Appellee:

         Hon. Mike McGrath, Attorney General; Daniel Guzynski, Assistant Attorney
General, Helena, Montana

         Dennis Paxinos, Yellowstone County Attorney; Ingrid A. Rosenquist, Deputy
County Attorney, Billings, Montana

               Submitted on Briefs:  May 28, 2008

                     Decided:  August 5, 2008

Filed:

_____
                       Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Lindsey Denae Whisler (Whisler) appeals from the denial of her motion to suppress evidence by the Thirteenth Judicial District Court, Yellowstone County, relating to her conviction for felony possession of dangerous drugs. We affirm.

¶2 We review the following issue on appeal:

¶3 *Did the District Court correctly deny Whisler's motion to suppress evidence?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 Billings police officers responded to a complaint regarding a "strange smell" emanating from a guest room at the Red Roof Inn, on October 6, 2006. The hotel staff informed Officer Neil Lawrence and another officer that Whisler, a child, and an African-American male had occupied the room. The staff described the male as five feet six inches tall, weighing approximately two hundred pounds, and having a shaved head and gold front teeth. The officers contacted Whisler at the hotel room. The officers relayed the complaint to Whisler and left without taking any further action.

¶5 Officer Jordan Aguilar responded to a shooting complaint near the Billings airport on October 7, 2006. Whisler had called the Billings Police Department earlier that day to report that several people in a vehicle had followed her car and had shot at her car. Whisler reported that she was traveling on North 27th Street. Officer Aguilar was patrolling in the area at the time of Whisler's call. Officer Aguilar remained in the area and waited to make contact with Whisler.

¶6 Whisler did not arrive. Officer Aguilar headed toward the area that Whisler had described as the location of the shooting. Officer Aguilar made contact with an African-

American male walking in the vicinity of the shooting. This person identified himself as Aaron Turner and stated that he previously had lived in the "Bay Area." He had gold caps on his front teeth with the letters F-A-C-E. He stated that he was simply "wandering around" when the officers contacted him.

¶7 Officer Aguilar eventually interviewed Whisler at the police station regarding the reported shooting near the airport. Whisler refrained initially from providing the identities of the passengers in her car during the shooting. She ultimately stated that her child, her boyfriend, and another person had been in the car. Whisler identified her boyfriend as an African-American male named Jamal Henderson who went by the street name of "Face." Officer Aguilar ran the name "Jamal Henderson" through the National Crime Information Center database. The database revealed that a person named Jamal Henderson from Oakland, California, had a record of violent offenses.

¶8 Officer Lawrence did not participate directly in the investigation of the shooting that had occurred near the airport. Officer Lawrence learned details of the shooting, however, from other officers and their investigation. The shooting near the airport reportedly had involved Whisler and her vehicle. Officers had found an abandoned vehicle in the vicinity of the airport that officers had linked to a separate shooting that had taken place a few weeks earlier. The investigation revealed that some people might have participated in both shootings. A jogger had discovered a shotgun and semi-automatic rifle abandoned in the area of the shooting near the airport. Officer Lawrence's sergeant informed him that officers had made contact near the airport with a person identified both, as Jamal Henderson, and, as

3

Aaron Turner. The officers' description of this person matched the description provided by the Red Roof Inn staff of the African-American male who had stayed with Whisler.

¶9     Officer Lawrence searched the parking lots of area hotels for Whisler's vehicle on October 8, 2006, in an attempt to locate Whisler and her boyfriend. Officer Lawrence had determined to arrest Whisler's boyfriend for obstructing justice for giving a false name when questioned by officers regarding the shooting. Officer Lawrence sought to obtain the true identity of Whisler's boyfriend and to ascertain his level of involvement in the shootings. Officer Lawrence located Whisler's car at the Comfort Inn. Hotel staff confirmed that a couple matching the descriptions of Whisler and her boyfriend occupied Room 121.

¶10    Officer Lawrence called in additional officers, including Special Weapons and Tactics (SWAT) team members, to assist with the contact. Six officers converged on Room 121. Two officers covered the window of Room 121 while Officer Lawrence and three additional officers approached the room's door. Five of the officers had long rifles and one officer had a duty handgun. The officers held their weapons at the low-ready position as they approached the room.

¶11    Officer Lawrence knocked on the door. Someone inside the room asked who had knocked. Officer Lawrence stated that Billings police officers stood outside and advised the person to open the door. Whisler's boyfriend opened the door. The officers ordered him to the ground. Whisler's boyfriend complied, laying on the ground with his body half in and half out of the hotel room. Officers Lawrence and Aguilar entered the room while an additional officer placed Whisler's boyfriend, still lying on the ground, in handcuffs.

4

¶12 The officers discovered Whisler in the room and ordered her to leave the room. The officers then conducted what they described as a "protective sweep" that lasted approximately ten to twenty seconds. Officer Lawrence saw a glass pipe on the bed during the sweep. He also saw a plastic bag that appeared to contain marijuana sticking out of a black bag on an end table during the sweep.

¶13 The officers arrested Whisler for possession of drugs and drug paraphernalia and transported her to the Yellowstone County Detention Facility. Whisler admitted to officers at the detention center that she possessed methamphetamine. The officers located a small bag on Whisler and tested the bag's contents. The contents field-tested positive for methamphetamine. Officers learned as a result of the arrests that Curtis Turner (Turner) was the true name of Whisler's boyfriend.

¶14 The State charged Whisler with a felony drug charge for the methamphetamine found on her person and two misdemeanor charges for the marijuana and the pipe found in the hotel room. Whisler moved the District Court to suppress the evidence of the drugs found during the hotel investigation. The court orally denied Whisler's motion. Whisler pled guilty to the felony drug charge and the State dismissed the misdemeanor charges. Whisler appeals the District Court's denial of her motion to suppress.

**STANDARD OF REVIEW**

¶15 We review a district court's denial of a motion to suppress to determine whether the court's findings of fact are clearly erroneous and whether it correctly interpreted and applied the law. *State v. Cooney*, 2006 MT 318, ¶ 9, 335 Mont. 55, ¶ 9, 149 P.3d 554, ¶ 9. We will

deem a district court's findings of fact clearly erroneous if they are unsupported by substantial evidence, if the district court misapprehended the effect of the evidence, or if the district court made a mistake. *Cooney*, ¶ 9.

¶16 We review a district court's evidentiary rulings for an abuse of discretion. *State v. Gomez*, 2007 MT 111, ¶ 18, 337 Mont. 219, ¶ 18, 158 P.3d 442, ¶ 18. A district court abuses its discretion when it acts arbitrarily without conscientious judgment or exceeds the bounds of reason. *Gomez*, ¶ 18.

## DISCUSSION

¶17 *Did the District Court correctly deny Whisler's motion to suppress evidence?*

¶18 Whisler argues that the District Court should have granted her motion to suppress the evidence that she possessed methamphetamine. Whisler first asserts that the District Court abused its discretion when it permitted the State to ask leading questions during the hearing on Whisler's motion to suppress. The State responds that the rules of evidence do not apply at a hearing on a motion to suppress.

¶19 We previously have stated that the rules of evidence do not apply in a suppression hearing with regard to whether adequate foundational evidence existed for admitting the results of an analyzer of breath alcohol concentration. *State v. Delaney*, 1999 MT 317, ¶ 16, 297 Mont. 263, ¶ 16, 991 P.2d 461, ¶ 16. We relied in *Delaney* on Rule 104(a) of the Montana Rules of Evidence. Rule 104(a) provides: "Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court. In making its determination it is not bound by the rules of evidence except those with respect to privileges." We

6

recognized in *Delaney* the similarity between Montana's Rule 104(a) and Rule 104(a) of the Federal Rules of Evidence. *Delaney*, ¶ 15. We noted that federal courts also have permitted trial courts to consider evidence normally inadmissible at trial in determining whether an adequate foundation existed for the admission of evidence. *Delaney*, ¶ 15. We concluded in *Delaney* that Rule 104(a) authorized the court to consider a certification form that may have constituted inadmissible hearsay when determining the admissibility of breathalyzer results. *Delaney*, ¶ 16.

¶20 Whisler argues that to refrain from applying the rules of evidence at suppression hearings would violate significant constitutional rights. The State notes that the U.S. Supreme Court has stated that the rules of evidence do not apply in pretrial determinations of the admissibility of evidence. *United States v. Matlock*, 415 U.S. 164, 94 S. Ct. 988 (1974); *see also Bourjaily v. United States*, 483 U.S. 171, 107 S. Ct. 2775 (1987). Although this Court has advanced this same proposition, we recognize that we have addressed the applicability of the rules of evidence under Rule 104(a) in very limited contexts. *See e.g. Delaney*, ¶ 16 (rules of evidence do not apply for determining whether a breathalyzer has a valid certification form); *Town of Columbus v. Harrington*, 2001 MT 258, 307 Mont. 215, 36 P.3d 937 (rules do not apply when determining whether a training manual could establish that a breathalyzer was a valid model); *Ponderosa Pines Ranch, Inc. v. Hevner*, 2002 MT 184, 311 Mont. 82, 53 P.3d 381 (rules do not apply when determining whether adequate authentication existed for aerial photos). Our review of the record reveals, however, that we need not resolve fully the applicability of the rules of evidence to the use of leading

questions at the suppression hearing in light of the State's burden at the hearing and the facts established at the hearing through responses to non-leading questions.

¶21 The Fourth Amendment of the United States Constitution and Article II, Section 11 of the Montana Constitution protect individuals from unreasonable searches and seizures. *State v. Logan*, 2002 MT 206, ¶ 13, 311 Mont. 239, ¶ 13, 53 P.3d 1285, ¶ 13. The protection from unreasonable searches and seizures afforded to individuals in their private residences extends to guests in motel rooms. *State v. Wakeford*, 1998 MT 16, ¶ 21, 287 Mont. 220, ¶ 21, 953 P.2d 1065, ¶ 21. We presume illegal and unreasonable a search and seizure conducted by the State without a warrant. *Logan*, ¶ 13.

¶22 Whisler contends that the officers illegally had entered the hotel room after Turner's arrest. She asserts that the officers had no lawful right to observe the marijuana and glass pipe, and, therefore, had no lawful right to arrest her. She argues that her revelation at the detention center that she possessed methamphetamine came as a result of this invalid arrest. The State responds that the officers had entered the hotel room during a "protective sweep" incident to Turner's arrest. The State claims that the officers had been standing in a lawful position when they observed the marijuana and glass pipe. The State argues that the officers had probable cause to arrest Whisler and that the State could rely on Whisler's admission at the detention center.

¶23 We have recognized § 46-5-102, MCA, as an exception to the warrant requirement that authorizes a peace officer conducting a lawful arrest to search the arrested person and the area within the person's immediate presence for limited purposes. *State v. Cooney*, 2006

8

MT 318, ¶ 11, 335 Mont. 55, ¶ 11, 149 P.3d 554, ¶ 11. Specifically, § 46-5-102(1), MCA, authorizes an officer to conduct a reasonable search for the purpose of "protecting the officer from attack." We have determined that a search conducted pursuant to § 46-5-102(1), MCA, inherently anticipates exigent circumstances. *State v. Hardaway*, 2001 MT 252, ¶ 57, 307 Mont. 139, ¶ 57, 36 P.3d 900, ¶ 57. We do not require the State to make a separate showing of exigent circumstances when an officer conducts a search pursuant to § 46-5-102(1), MCA. *Cooney*, ¶ 13. The search must remain commensurate, however, with the underlying purposes of preventing the arrestee from using any weapons that he or she may possess. *Hardaway*, ¶ 57.

¶24 The State must present articulable facts, along with the rational inferences that an officer may draw from those facts, that warrant a reasonably prudent officer to believe that the area subject to the protective sweep may harbor a person posing a danger to those on the arrest scene. *State v. Olson*, 2002 MT 211, ¶ 15, 311 Mont. 270, ¶ 15, 55 P.3d 935, ¶ 15 (citing *Maryland v. Buie*, 494 U.S. 325, 333-34, 110 S. Ct. 1093, 1098 (1990)). An officer may seize evidence that has an immediately apparent incriminating nature when the officer discovers the evidence in plain view from his or her lawful presence. *State v. Lewis*, 2007 MT 295, ¶ 22, 340 Mont. 10, ¶ 22, 171 P.3d 731, ¶ 22.

¶25 The State called Officer Lawrence to testify at the hearing. The following colloquies between the prosecutor and Officer Lawrence concerned Officer Lawrence's knowledge of Turner and Whisler before Turner's arrest at the hotel. The colloquies demonstrate that

Office Lawrence established through his testimony facts relevant to the protective sweep of the hotel room in response to non-leading questions.

¶26 Officer Lawrence testified regarding his knowledge of Whisler's and Turner's connection to the airport shooting. Officer Lawrence further testified that the airport shooting had a connection to a previous shooting. He stated that both shootings had involved weapons and that they may have been drug-related.

> PROSECUTOR: [D]uring the dispatch [of the shooting near the airport] you heard the names of the individuals that were involved with the shooting; is that correct?
>
> OFFICER LAWRENCE: I don't remember if I heard names, but I later talked to the officers on the scene who mentioned the names.
>
> PROSECUTOR: And did those names ring a bell with you?
>
> OFFICER LAWRENCE: Yes.
>
> PROSECUTOR: And what were the names?
>
> OFFICER LAWRENCE: One of the names was Ms. Whisler's and another name was an Aaron Turner.
>
> PROSECUTOR: Now, were there any other names involved [in the shooting near the airport] that rang a bell with earlier shootings . . . in Billings?
>
> OFFICER LAWRENCE: Yeah. There was a shooting at the 12th Planet a few weeks prior to the airport shooting and some of the individuals involved with that, at least one of the vehicles involved, was located after the shooting that occurred up at the airport.
>
> . . .
>
> PROSECUTOR: Was there significant gun power at both of these shootings?

10

OFFICER LAWRENCE: Yes. At the 12th Planet shooting, I don't know exactly the guns that were involved, but there were gun casings--shell casings--excuse me--all over the parking lot. The shooting at the airport, they found a shotgun and an automatic or a semi-automatic rifle, I believe.

PROSECUTOR: Where were those guns found, to your knowledge?

OFFICER LAWRENCE: After the shooting, I think somebody just running, jogging, found those two rifles in a mud puddle in the area where they had found the vehicle that was supposed to be involved, who had shot at Ms. Whisler's car.

.  .  .

PROSECUTOR: In the investigation . . . [was] there some suspicion of . . . the purpose of these gun fights that had been happening?

OFFICER LAWRENCE: It was over drugs, is what we could determine.

¶27 Officer Lawrence also testified about the reason that he and Officer Aguilar sought to arrest Turner and his knowledge that Turner and Whisler had been staying together.

PROSECUTOR: What were your concerns in regards to [Turner]?

OFFICER LAWRENCE: I had really no concerns, but he had obviously--we didn't have a positive ID on him. We believed he was involved in the shooting that Ms. Whisler was involved with. And I had an idea where he was staying. So Sergeant Chapman and I returned to [the Red Roof Inn] they'd been at on the 6th.

.  .  .

PROSECUTOR: So the 7th you go to the Red Roof Inn, they're not there?

OFFICER LAWRENCE: Correct.

PROSECUTOR: Did the hotel staff have an idea where they had gone?

OFFICER LAWRENCE: The hotel staff advised me that they had

11

received a call from the Holiday Inn, that supposedly somebody at the Holiday Inn said Ms. Whisler had stayed there with this same subject who matched the description [of Turner] that Sergeant Chapman had.

¶28 Whisler's counsel called Officer Aguilar to testify at the suppression hearing concerning Officer Aguilar's investigation of the airport shooting and Turner's arrest. Whisler does not challenge the testimony of Officer Aguilar as solicited by her counsel during direct examination and by the State during cross-examination. Officer Aguilar's testimony also provided facts relevant to the protective sweep of the hotel room during Turner's arrest.

¶29 Officer Aguilar stated that Whisler had declined to proceed to an area controlled by the police after reporting that another car and its passengers had followed her car and had shot at her. Officer Aguilar located Turner walking in the vicinity of the shooting. Turner asserted that he simply had been "wandering around" in the area. Officer Aguilar later discovered from Whisler, however, that Turner had ridden in the car during the shooting. Officer Aguilar testified that he had found suspicious Turner's choice to get out of the car in the vicinity of a shooting after Whisler had contacted the police.

¶30 Turner told Officer Aguilar that his first name was "Aaron" and that he was from the "Bay Area." Whisler falsely had identified Turner as "Jamal Henderson" to Officer Aguilar. A background check revealed that a person named Jamal Henderson from Oakland, California, had a record of violent offenses. Officer Aguilar testified that he and Officer Lawrence did not know Turner's true identity when they went to arrest him at the hotel room.

12

¶31   The witnesses at the hearing provided all of these facts in responses to non-leading questions, questions posed by Whisler's counsel, and questions posed by the State during cross-examination. The District Court provided the following explanation for allowing the evidence from the search of the hotel room pursuant to a protective sweep:

> [Turner and Whisler] have some connection to [these shootings]. We don't know whether or not they're pure victims or perhaps involved in the drug trade. So you check out the room. You check for weapons. You check for others that might be in the room. That's standard operating procedure. If you don't do it, sooner or later as a policeman you're going to end up dead.

The transcript of the suppression hearing reveals that the officers established facts, along with the rational inferences available from those facts, that warranted Officer Lawrence reasonably to believe that a protective sweep of the hotel room during Turner's arrest constituted a reasonable measure taken to protect the individuals on the arrest scene.

¶32   Whisler argues that Officer Lawrence did not need to conduct a protective sweep because Turner had offered no resistance during his arrest. Section 46-5-102(1), MCA, authorizes an officer to conduct a protective sweep of both the person arrested and the area within the person's immediate presence, however, in order to ensure that the area does not "harbor[] an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334, 110 S. Ct. at 1098. Officer Lawrence had no way of confirming the number, the identities, and the propensities of any other people who might happen to be in the hotel room.

¶33   The witnesses at the suppression hearing established facts demonstrating that Officer Lawrence's limited search of Turner's hotel room constituted a reasonable measure undertaken to ensure the safety of all people present at the arrest scene. Officer Lawrence

13

stood in a lawful position when he observed the substance that resembled marijuana and the glass pipe. Whisler's admission that she possessed methamphetamine, therefore, did not stem from evidence obtained by an unreasonable search and seizure. The District Court properly denied Whisler's motion to suppress.

¶34 Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ JOHN WARNER
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ JIM RICE